**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| IN RE SPECTRUM BRANDS LITIGATION | ) | No. 19-cv-347-jdp |
|  | ) |  |
|  | ) |  |

---

**LEAD PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

---

RATHJE WOODWARD LLC
Douglas M. Poland
State Bar No. 1055189
10 E. Doty Street, Suite 507
Madison, Wisconsin 53703
Telephone: (608) 960-7430
Facsimile: (608) 960-7460
dpoland@rathjewoodward.com

*Liaison Counsel for Lead Plaintiffs The
Public School Teachers' Pension and
Retirement Fund of Chicago and the
Cambridge Retirement System
and the Class*

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, Illinois 60611
Telephone: (312) 373-3880
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

Katherine M. Sinderson
Jai Chandrasekhar
Matthew Traylor
1251 Avenue of Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
KatieM@blbglaw.com
Jai@blbglaw.com
Matthew.Traylor@blbglaw.com

*Lead Counsel for Lead Plaintiffs The Public
School Teachers' Pension and Retirement
Fund of Chicago and the Cambridge
Retirement System
and the Class*

<u>TABLE OF CONTENTS</u>

Pages

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................... 6

        A.      Spectrum's Background and Plans for Consolidation ............................ 6

        B.      The Consolidations Suffered From "Underlying Structural" Problems From the
                Beginning ........................................................................................... 7

                1.      The GAC Consolidation Experienced Severe Delays. ............................. 7

                2.      The HHI Consolidation Also Did Not "Progress Smoothly." .................. 9

        C.      The Botched Consolidations Negatively Affected Relationships with Major
                Retailers and Payments to Key Vendors ..................................................... 11

        D.      Spectrum's Consolidation Challenges Were Not "Temporary." ......................... 13

        E.      Defendants Claimed to Have Closed HHI's West Coast Facility When They
                Never Did, and it Remains Open to This Day. ......................................... 13

        F.      Spectrum Fires Defendant Rouvé, as Defendants Are Forced to Admit Significant
                Problems in the Consolidations. ........................................................... 14

III.    ARGUMENT .................................................................................................... 16

        A.      The Complaint Adequately Alleges Materially False and Misleading Statements
                and Omissions ................................................................................. 17

                1.      The Complaint Alleges that Spectrum's Statements About Its
                        Consolidation Projects Were False and Misleading When Made ............. 22

                2.      Defendant's False and Misleading Statements Are Not Protected
                        by the PSLRA's Safe Harbor. ...................................................... 24

                3.      Defendants' Statements About the Consolidations Are Not
                        Nonactionable Opinions .......................................................... 27

                4.      Defendants' Statements About the GAC and HHI Consolidations
                        Were Not Puffery. ................................................................ 30

        B.      The Complaint Pleads a Strong Inference of Scienter. ................................. 34

                1.      The Executive Defendants Personally Received Reports That
                        Contradicted Their Public Statements. ......................................... 36

                2.      The Executive Defendants' Direct Reports Were Intimately
                        Involved In Addressing the Significant Problems With the
                        Consolidations ................................................................... 39

                3.      The Consolidations Were a "Transformational" Initiative and Were
                        Critically Important to the Company. ........................................... 41

i

4.      Spectrum's Largest Customers Threatened to Leave and Levied Penalties of Millions of Dollars Due to the Consolidations' Failures. ................................................................... 42

5.      Spectrum's Firing of Rouvé Supports His Scienter. .................................. 44

6.      Defendants' Frequent Discussion of the Consolidations Strongly Supports Their Scienter. ................................................................... 45

7.      The Problems Were Internally Well Known, Pervasive, Longstanding, and Highly Material. ........................................... 46

8.      Defendants Do Not Offer a Compelling Competing Inference of Scienter. ................................................................... 47

C.      Lead Plaintiffs Have Standing to Assert Claims On Behalf of Purchasers of HRG Stock Against Spectrum Legacy. ........................................... 51

1.      Purchasers of HRG Stock May Bring Claims Against Spectrum and the Executive Defendants. .................................. 52

2.      Plaintiffs Complied with the PSLRA in Bringing Claims on Behalf of Purchasers of HRG Stock. .................................. 57

D.      The Complaint Alleges Section 20(a) Claims. .................................. 59

IV.     CONCLUSION ................................................................... 59

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ....................................................................................4, 35

*Alizadeh v. Tellabs, Inc.*,
    2015 WL 557249 (N.D. Ill. Feb. 9, 2015) ...................................................................18

*APA Excelsior III, L.P. v. Windley*,
    329 F. Supp. 2d 1328 (N.D. Ga. 2004) .......................................................................56

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................17

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) .......................................................................................26

*Bach v. Amedisys, Inc.*,
    2016 WL 4443177 (M.D. La. Aug. 19, 2016) ...........................................................46

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1998)...........................................................................................17, 18, 55

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................................16

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) ........................................................................50

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002)........................................................................................17

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
    2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ............................................................45

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)......................................................................................................53

*Central Laborers' Pension Fund v. SIRVA, Inc.*,
    2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) ......................................................31, 32

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) .......................................................................................17

*Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*,
    114 F. Supp. 3d 633 (N.D. Ill. 2015) ....................................................................42, 46

*Desai v. Gen. Growth Props., Inc.*,
   654 F. Supp. 2d 836 (N.D. Ill. 2009) ............................................................................ passim

*Duane & Virginia Lanier Trust v. SandRidge Mississippian Trust I*,
   361 F. Supp. 3d 1162 (W.D. Okla. 2019) ...........................................................................56, 57

*Eisenstadt v. Centel Corp.*,
   113 F.3d 738 (7th Cir. 1997) .....................................................................................34

*First Commodity Corp. of Boston v. CFTC*,
   676 F.2d 1 (1st Cir. 1982) .........................................................................................49

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018) ..........................................................................50

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..........................................................................46

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wis. 2003) .........................................................................18

*Fulton City Employees' Retirement System v. MGIC Investment Corp.*,
   675 F.3d 1047 (7th Cir. 2012) ...................................................................................33

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
   2012 WL 1068761 (N.D. Ill. Mar. 29, 2012) ..................................................................48

*Gibson v. City of Chicago*,
   910 F.2d 1510 (7th Cir. 1990) ...................................................................................17

*Greenberg v. Bear Stearns & Co.*,
   80 F. Supp. 2d 65 (E.D.N.Y. 2000) .............................................................................58

*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) ..........................................................................44

*Henningsen v. ADT Corp.*,
   161 F. Supp. 3d 1161 (S.D. Fla. 2015) ........................................................................50

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) .....................................................................................48

*Hill v. Tribune Co.*,
   2006 WL 2861016 (N.D. Ill. Sept. 29, 2006) ................................................................58

*I.B.E.W. Local 697 Pension Fund v. Limited Brands, Inc.*,
   788 F. Supp. 2d 609 (S.D. Ohio 2011) ......................................................................48, 49

*Iles v. Swank,*
  2006 WL 1806365 (N.D. Ill. June 28, 2006) ................................................................21, 27

*In Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723 (1975) .................................................................................................................56

*In re Akorn, Inc. Sec. Litig.,*
  240 F. Supp. 3d 802 (N.D. Ill. 2017) .......................................................................19, 31, 44

*In re ArthroCare Corp. Sec. Litig.,*
  726 F. Supp. 2d 696 (W.D. Tex. 2010).................................................................................46

*In re Biogen Inc. Sec. Litig.,*
  193 F. Supp. 3d 5 (D. Mass. 2016) .......................................................................................51

*In re Bristol Myers Squibb Co. Sec. Litig.,*
  586 F. Supp. 2d 148 (S.D.N.Y. 2008) ..................................................................................17

*In re Cisco Sys. Inc. Sec Litig.,*
  2013 WL 1402788 (N.D. Cal. Mar. 29, 2013).....................................................................50

*In re Galena Biopharma, Inc. Sec. Litig.,*
  117 F. Supp.3d 1145 (D. Or. 2015) ......................................................................................54

*In re Gentiva Sec. Litig.,*
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................................................58

*In re Harley-Davidson, Inc. Sec. Litig.,*
  660 F. Supp. 2d 969 (E.D. Wis. 2009)............................................................................37, 38

*In re HD Supply Holdings, Inc. Sec. Litig.,*
  341 F. Supp. 3d 1342 (N.D. Ga. 2018) .....................................................................19, 20, 31

*In re HealthSouth Corp. Sec. Litig.,*
  257 F.R.D. 260 (N.D. Ala. 2009)...........................................................................................54

*In re HealthSouth Corp. Sec. Litig.,*
  CV-03-BE-1500-S (N.D. Ala. Feb. 4, 2009) ........................................................................54

*In re MF Global Holdings Ltd. Sec. Litig.,*
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................................50

*In Re Midway Games, Inc. Sec. Litig.,*
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) ..................................................................................32

*In re Netbank, Inc. Sec. Litig.,*
  2009 WL 2432359 (N.D. Ga. Jan. 29, 2009)........................................................................50

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007)..................................................................56

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 622 (S.D.N.Y. 2014)....................................................44

*In re Par Pharm. Sec. Litig.*,
   2009 WL 3234273 (D.N.J. Sept. 30, 2009) .........................................44

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) .............................................................25

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................44

*In re Thoratec Corp. Sec. Litig.*,
   2006 WL 1305226 (N.D. Cal. May 11, 2006) ......................................50

*In re Tibco Software, Inc.*,
   2006 WL 1469654 (N.D. Cal. May 25, 2006) ......................................50

*In re Valujet, Inc. Sec. Litig.*,
   984 F. Supp. 1472 (N.D. Ga. 1997) .....................................................55

*In re Westell Techs., Inc.*,
   2001 WL 1313785 (N.D. Ill. Oct. 26, 2001).........................................59

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
   237 F. Supp. 3d 492 (S.D. Tex. 2017) .................................................50

*Jones v. Corus Bankshares, Inc.*,
   701 F. Supp. 2d 1014 (N.D. Ill. 2010) .................................................34

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*,
   139 S. Ct. 2615 (2019)..........................................................................24

*Kipling v. Flex, Ltd.*,
   2019 WL 1472358 (N.D. Cal. Apr. 3, 2019) ........................................58

*Lionheart Partners, Inc. v. M-Wave, Inc.*,
   923 F. Supp. 1085 (N.D. Ill. 1996) ...............................................20, 38

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ........................................................ passim

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ........................................................ passim

vi

*Marcus v. J.C. Penney Co., Inc.*,
  2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ...............................................................31, 34

*Marks v. CDW Comp. Ctrs., Inc.*,
  122 F.3d 363 (7th Cir. 1997) .....................................................................................30

*Mathews v. Centex Telemanagement, Inc.*,
  1994 WL 269734 (N.D. Cal. June 8, 1994) .................................................................50

*Matrixx Initiatives Inc. v. Siracusano*,
  563 U.S. 27 (2011)........................................................................................................1

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990).................................................................................17, 23

*Narducci v. Moore*,
  572 F.3d 313 (7th Cir. 2009) .....................................................................................53

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 Fed. App'x. 10 (2d Cir. 2011)..............................................................................46

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015).........................................................................................28, 29

*Ontario Pub. Servs. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*,
  369 F.3d 27 (2d Cir. 2004)..........................................................................................56

*Perez v. Higher One Holdings, Inc.*,
  2016 WL 6997160 (D. Conn. Sept. 13, 2016) ...........................................................27

*Plumbers & Pipefitters Local Union No. 630 Pension Annuity Trust Fund. v.*
  *Allscripts-Misys Healthcare Solutions, Inc.*,
  778 F. Supp. 2d 858 (N.D. Ill. 2011). Dkt. 21 ..........................................................34

*Plumbers & Pipefitters Local Union v. Zimmer*,
  673 F. Supp. 2d 718 (S.D. Ind. 2009) ..................................................................37, 51

*Plymouth Cty. Ret. Ass'n v. Advisory Bd. Co.*,
  370 F. Supp. 3d 60 (D.D.C. 2019) .............................................................................33

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
  2018 WL 844420 (N.D. Ill. Feb. 12, 2018) .......................................................passim

*Rauch v. Vale, S.A.*,
  378 F. Supp. 3d 198 (E.D.N.Y. 2019) ........................................................................58

*Roots P'ship v. Land's End, Inc.*,
  965 F.2d 1411 (7th Cir. 1992) ....................................................................................56

*Ross v. Career Educ. Corp.*,
  2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)....................................................44

*Roth v. Aon Corp.*,
  2008 WL 656069 (N.D. Ill. Mar. 7, 2008)......................................................38

*Salomon Analyst Metromedia Litig.*,
  544 F.3d 474 (2d Cir. 2008)...........................................................................55

*Schleicher v. Wendt*,
  529 F. Supp. 2d 959 (S.D. Ind. 2007) ......................................................42, 46

*Searles v. Glasser*,
  64 F.3d 1061 (7th Cir. 1995) .........................................................................33

*SEC v. First Am. Bank & Trust Co.*,
  481 F.2d 673 (8th Cir. 1973) ................................................................. passim

*SEC v. Ustian*,
  229 F. Supp. 3d 739 (N.D. Ill. 2017) .............................................................31

*Seidel v. Byron*,
  2008 WL 4411541 (N.D. Ill. Sept. 26, 2008) ................................................17

*Selbst v. McDonald's Corp.*,
  2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) ................................................38

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000)...........................................................................55

*Sequel Capital, LLC v. Rothman*,
  2003 WL 22757758 (N.D. Ill. Nov. 20, 2003) ..............................................21

*Shenk v. Karmazin*,
  867 F. Supp. 2d 379 (S.D.N.Y. 2011)............................................................42

*Silverman v. Motorola, Inc.*,
  2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ...............................19, 31, 32, 36

*Sousa v. Sonus Networks, Inc.*,
  261 F. Supp. 3d 112 (D. Mass. 2017) .............................................................38

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)..........................................................................53, 54, 55, 57

*Stransky v. Cummins Engine Co.*,
  51 F.3d 1329 (7th Cir. 1995) .................................................................. passim

*Sutton v. Bernard*,
  2001 WL 897593 (N.D. Ill. Aug. 9, 2001) .............................................................44

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................4, 35, 36, 49

*Tongue v. Sanofi*,
  816 F.3d 199 (2d. Cir. 2016)...................................................................................27

*Tyler v. Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011)......................................................................50

*United Union Roofers, Waterproofers & Allied Workers Local Union No. 8 v.*
  *Great Lakes Dredge & Dock Corp.*,
  2014 WL 12780549 (N.D. Ill. Oct. 21, 2014).........................................................44

*Van Noppen v. InnerWorkings, Inc.*,
  136 F. Supp. 3d 922 (N.D. Ill. 2015) .......................................................................33

*Worrell v. Wells Fargo Bank, N.A.*,
  2014 WL 12726562 (W.D. Wis. Jan. 27, 2014) .......................................................53

*Ziemba v. Cascade Int'l Inc.*,
  256 F.3d 1194 (11th Cir. 2001) ...............................................................................55

**STATUTES**

15 U.S.C. § 78t...................................................................................................................59

15 U.S.C. § 78u–4(a)(3)(A) ...............................................................................................57

15 U.S.C. §78u–4(b)(2) .....................................................................................................34

15 U.S.C. § 78u–5(c)(1).....................................................................................................24

**OTHER AUTHORITIES**

*Merriam-Webster's Collegiate Dictionary* 869 (11th ed. 2014) ....................................23

## I.      INTRODUCTION

This securities-fraud class action is about Spectrum Brands Holdings, Inc.'s ("Spectrum's" or the "Company's") false statements to investors concerning Spectrum's "major transformational" consolidation of operations during the Class Period. The Defendants are Spectrum, three of Spectrum's top executives, and Spectrum's former holding company, HRG Group, Inc. ("HRG"). Lead Plaintiffs bring claims on behalf of themselves and all other persons or entities who purchased Spectrum or HRG securities during the period from January 26, 2017 to November 19, 2018, inclusive (the "Class Period") and were damaged by Spectrum's materially misleading false statements (the "Class").[1] Spectrum's consolidation was the Company's most important corporate operation during the Class Period and was critical to the Company's financial future. When, as discussed below, the consolidation failed, the Class suffered hundreds of millions of dollars in losses as a result. This action seeks to recover those losses.

The Complaint's detailed allegations of Defendants' false public statements and omissions of material information about the Consolidations state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission Rule 10b–5. To state a claim under Section 10(b) and Rule 10b–5, the plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 36–38 (2011). Defendants' motion challenges the sufficiency of Plaintiffs' Complaint only with respect to the first two elements, arguing that the Complaint does

---

[1] All references in this memorandum in the form "¶__" are to the Amended Class Action Complaint for Violations of the Federal Securities Laws filed on July 12, 2019 (Dkt. 14) (the "Complaint"). Unless otherwise specified, all emphasis in quotations is added, and internal citations and quotation marks are omitted.

not adequately allege actionable misrepresentations or that those misrepresentations were made with scienter. Defendants also challenge Plaintiffs' standing to bring claims on behalf of some (but not all) of the Class, i.e., only those investors who purchased HRG stock before the HRG-Spectrum merger.

Defendants are wrong on each of the three attacks they level at the Complaint. The Complaint sets forth facts demonstrating that throughout the Class Period, Defendants Spectrum; its former CEO, Andreas R. Rouvé; David M. Maura, who became CEO when Spectrum fired Rouvé; and its CFO, Douglas L. Martin, all consistently reassured investors that the supply-chain consolidations of two Spectrum divisions' into a single facility for each division (the "Consolidations") were "on schedule" and "progressing smoothly." Specifically, Defendants publicly represented time and again that Spectrum's Global Auto Care ("GAC") division was successfully consolidating four facilities into one enormous manufacturing and distribution center in Dayton, Ohio (the "Dayton Center"), and that the Hardware and Home Improvement ("HHI") division was successfully consolidating two facilities into one enormous distribution center in Edgerton, Kansas (the "Edgerton Center"). Defendants also made other specific comments providing reassuring – but false – information about facts important to investors such as facility closure dates, "fill rates," and inventory backlogs, because the progress of these "transformational" Consolidations was the target of enormous analyst and investor attention during the Class Period.

All these statements were false, and Defendants knew them to be false or were reckless in making them. In fact, nearly twenty former Spectrum employees have confirmed that the Consolidations suffered from what analysts later diagnosed as "underlying structural issues" that Defendants hid. The Consolidations were, in reality, well behind schedule and were functionally non-operational for most of the Class Period. Investors did not learn the truth about the status of

the Consolidations until 2018, when Spectrum reported two separate quarters of terrible financial results. Defendants acknowledged that the results were due to previously undisclosed problems at the Dayton and Edgerton Centers. Spectrum announced, in a tacit attribution of fault, that it had fired its CEO, Defendant Rouvé, and replaced him with Defendant Maura. As Spectrum and HRG stock plummeted in response to these disclosures, Spectrum and HRG shareholders lost hundreds of millions of dollars.

In seeking dismissal of shareholders' claims, Defendants raise a series of arguments that contradict the well-pleaded facts in the Complaint (rather than taking them as true as the law requires), contravene established Seventh Circuit law, and at best raise factual issues that cannot be resolved at this stage of the proceedings. First, it is important to note that Defendants do not challenge the Complaint's allegations concerning Defendant Rouvé's, Maura's, and Spectrum's repeated claims that Spectrum had successfully closed HHI's West Coast facility and transferred its operations to Kansas (thus supposedly demonstrating the success of the Consolidations and their significant progress). ¶¶ 96, 202, 218, 221, 247. Those statements were false, and that West Coast facility is in fact still open to this day. ¶ 96. They also do not challenge the Complaint's scienter theory concerning these statements—indeed, it would be absurd to suggest that the Company's CEOs did not know that the Company in fact continued to maintain a distribution center on the West Coast for some of HHI's most important products.

Having conceded that Defendants were willing to mislead investors about this foundational fact, Defendants would still have this Court dismiss as a matter of law all of Defendants' other statements concerning the supposed "progress" of the Consolidations. Defendants claim that, for example, certain statements were technically true, so that they cannot be held liable even if those statements misled investors. Dkt. 21, at 24-26. As discussed in Sections III.A, these arguments

defy long-established Seventh Circuit law and must be rejected. *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("If one speaks, he must speak the whole truth.").

Then, ignoring the substance of their statements, Defendants seize on any available linguistic hedge to argue that they did not make a single actionable representation. Defendants characterize 38 of the 42 statements cited in the Complaint as either uncertain future projections, Dkt. 21, at 27–33 (*see infra* Sections III.A.2); nebulous opinions by Spectrum executives, *id.* at 33–39 (*see infra* Section III.A.3); or immaterial puffery, *id.* at 39–43 (*see infra* Section III.A.4). The notion that, for over a year and a half, Defendants provided investors and analysts with nothing more than non-specific projections, vague opinions, or obvious puffery on the most important and complicated strategic initiatives the Company was undertaking, is entirely implausible, as Plaintiffs demonstrate below (*see infra* Section III).

Second, Defendants argue that Plaintiffs' allegations do not establish a strong inference of scienter. In the Seventh Circuit, scienter is adequately pleaded by demonstrating that a defendant knowingly made a false statement or recklessly disregarded "a substantial risk that it was false." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs III*"). A strong inference of scienter arises if, "when the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference . . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) ("*Tellabs II*"). Thus, "*Tellabs* now awards the draw to the plaintiff." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008).

Defendants' scienter argument ignores the blatant falsity of their repeated claims that HHI's California distribution center had closed and that all its operations had been transferred to Kansas; this statement could not have been made with anything less than recklessness. Defendants'

4

argument also fails because the Complaint alleges facts establishing that the individual Defendants were all informed of adverse facts about problems caused by the Consolidations that contradicted their public statements. Moreover, Spectrum's three largest customers, Walmart, Lowe's, and Home Depot, threatened to leave Spectrum and penalized the Company millions of dollars because of late and incorrect shipments, financial and reputational consequences that cannot have been a secret to its top management. The Consolidations posed such a significant threat to the Company that Spectrum fired its CEO (Defendant Rouvé) and GAC's president in April 2018 because of the Consolidations' problems, demonstrating that top executives were responsible for and aware of these problems that were concealed from investors. These and other well-pleaded facts discussed in Section III.B demonstrate that Defendants were at minimum reckless in telling investors that the Consolidations were progressing well and that any issues were transitory, and that Plaintiffs have adequately plead scienter.

Finally, Defendants assert that Plaintiffs' claims on behalf of purchasers of HRG stock before the Merger should be dismissed for two reasons: investors in one company (here, HRG) supposedly may not bring securities-fraud claims against another company (here, Spectrum); and HRG stockholders were not notified under the PSLRA of the opportunity to seek appointment as lead plaintiff. Defendants are wrong on both counts. First, as discussed in Section III.C.1, the Supreme Court has repeatedly held that claims for securities fraud may be brought against any person who makes false statements in connection with a purchase or sale of securities, not only against the issuer. Second, notices of this action were issued in accordance with the PSLRA with respect to both pre-Merger Spectrum stock and pre-Merger HRG stock, as well as post-Merger stock. Thus, Plaintiffs have standing to bring claims on behalf of purchasers of HRG stock.

Defendants' motion to dismiss should be denied.

5

## II.    STATEMENT OF FACTS

### A.    Spectrum's Background and Plans for Consolidation

Spectrum sells a variety of consumer goods to retail customers such as Walmart, Home Depot, and Lowe's. Because Spectrum relied on these retailers to sell its products, ¶ 31, it was vital for Spectrum to meet the terms of its Service Level Agreements ("SLAs") with retailers, which specified tight order-fulfillment times and "fill rates" (i.e., percentages of products ordered by a customer that are shipped). ¶ 87. Failure to meet the terms of these SLAs would result in lost sales, enormous penalties, and potentially cancellation of contracts. ¶¶ 136-139, 270, 272.

Two of Spectrum's five business segments are Global Auto Care ("GAC") and Hardware and Home Improvement ("HHI"), which collectively contributed approximately 35% of Spectrum's revenue during the Class Period. ¶ 31. In June 2016, Spectrum announced a plan to consolidate GAC's four manufacturing, distribution, and research-and-development facilities from across the country into one 570,000-square-foot facility in Dayton, Ohio (the "Dayton Center") ("the GAC Consolidation"). ¶ 33. Defendant Rouvé stated that the Dayton Center would open by "early 2017." ¶ 37. In February 2017, Defendants announced a similar project for HHI, consolidating HHI's two distribution facilities from California and North Carolina into a single facility in Edgerton, Kansas (the "Edgerton Center"), which would be "operational" by May 2017 and completed by December 2017 ("the HHI Consolidation"). ¶ 38.

The status of the Consolidations was a primary focus of Defendants, analysts, and investors in the Company's interactions with the market during the Class Period. ¶¶36, 44, 48, 51-52, 155-156, 159, 161, 164-165, 167, 173, 176, 178, 182, 185-86, 195, 204-05, 220, 233, 238-38, 250. Defendants were at pains to assure the market at every opportunity that these vital corporate actions were "on schedule" and "progressing smoothly." ¶¶ 4, 10, 46, 191, 197, 201-03, 206-07.

.

**B.     The Consolidations Suffered From "Underlying Structural" Problems From the Beginning**

**1.     The GAC Consolidation Experienced Severe Delays.**

Despite Defendants' statements that the Consolidations were "on schedule," "on track," and "going smoothly," Spectrum was significantly behind its stated schedule for the GAC Consolidation from the beginning of the Class Period. These delays violated Spectrum's own publicly stated deadlines and caused it to violate its agreements with customers, exposing Spectrum to massive penalties and destruction of its reputation. By the end of the Class Period, the GAC Consolidation had failed so miserably that Spectrum had to abandon the entire division, acquired only a few years earlier, through a distress sale to Energizer.

Numerous former GAC employees, from a Global Quality Manager to a Manufacturing Maintenance Technician, all uniformly corroborated the Complaint's allegations that the GAC Consolidation was significantly behind schedule and suffered from structural problems from the beginning:

*GAC Did Not Transfer Its Manufacturing Lines on Schedule*. Defendants told investors that they expected an "early 2017" completion date for the GAC Consolidation. Ken Burns, Spectrum's Vice President of Operations, told the *Dayton Business Journal* that to meet the Company's schedule, Spectrum would begin "cycling" (i.e., moving) the first of three A/C Pro manufacturing lines in the first week of January 2017 from GAC's Texas facility to the Dayton Center, followed by two remaining A/C Pro manufacturing lines by late January 2017, and followed "in short order" by Armor All manufacturing lines from Painesville, Ohio. ¶ 59. Despite Defendants repeatedly telling the market that the GAC Consolidation was "on track" and "on schedule," ¶¶ 46, 59, the first A/C Pro manufacturing lines were not transferred until July 2017,

six months behind schedule. ¶ 59. Spectrum did not fully transfer the Armor All manufacturing lines until fall 2019, approximately eight to nine months behind schedule.[2] *Id.*

***The GAC Facility Failed to Install Racking on Schedule***. The purpose of distribution centers is to efficiently and timely store, locate, retrieve, and ship products. Unbeknownst to investors, from the beginning of the Class Period in January 2017 until the beginning of 2018, the Dayton Center had not yet even installed the most basic of shelving—or "racking"—to store and organize its inventory. ¶ 70 (racking system "by no means" completed by January 2019). Racking systems are "integral to inventory management and quality control at distribution centers." ¶¶ 66–67. Defendant Maura later admitted that leaving inventory "all over the floor" (which was the case at each Center throughout the Class Period) "wasn't healthy." ¶ 66.

Spectrum's failure to institute a racking system, among other things, led to the Dayton Center's catastrophically high "scrap rate," which indicates the percentage of damaged products that must be discarded. ¶ 71. Scrapping defective products was highly harmful to the Company's financial bottom line, was tracked as a Key Performance Indicator ("KPI"), and was reported to headquarters in Middleton. ¶ 68. The industry-standard scrap rate is less than 2%. ¶ 71. FE 4, a Lead Quality-Control Technician at Spectrum in Dayton, who was responsible for documenting damage to inventory, confirmed that the Dayton Center's scrap rate was 30% through the entire Class Period, exceeding the industry standard by over 1,400%. ¶ 72.[3]

---

[2] These delays were confirmed by FE 1, a New Product Introduction Project manager who worked at the Dayton Center from January 2017 to December 2017. "FE" refers to the former Spectrum employees who are quoted in the Complaint and identified by job title, responsibilities, and tenure at the Company.

[3] In addition to the poor inventory-storage practices, which caused widespread damage to its inventory, the Dayton Center also lacked proper quality control and proper training for its manufacturing employees. Dayton Center employees routinely did not confirm that products were meeting product specifications, ¶ 74, or fix faulty production lines to minimize ongoing and future destruction of materials, ¶ 77.

*The Dayton Center Suffered from Serious Inventory Mismanagement*. The Dayton Center also lacked a standard inventory storage and management system, and its employees were not trained to effectively utilize the systems it did have. Spectrum's shortcomings in inventory management once again had disastrous consequences, including an inability to locate and track products, drastically inaccurate inventory counts, and duplicative, wasteful manufacturing. ¶¶ 79–80. During the first year-end inventory count in September 2017, the discrepancy between the system count and the floor count amounted to $10–$12 million in inventory, an error rate of at least 10%. ¶ 85. And because Spectrum could not efficiently store or locate inventory, the Dayton Center quickly ran out of space. To combat this overflow, Spectrum began renting an additional 200,000-square foot warehouse in September 2017 to store additional inventory. ¶ 86.

## 2.     The HHI Consolidation Also Did Not "Progress Smoothly."

Similarly, despite Defendants' claims that the HHI Consolidation was "progressing smoothly" and "on schedule," the HHI Consolidation (announced in February 2017) suffered serious undisclosed operational issues that eventually led to Spectrum secretly abandoning it. ¶ 90. Spectrum told investors in February 2017 that the Edgerton Center would be operational by May 2017 and completed by September 2017. ¶ 93. However, FE 8, an Internal Consultant who was in charge of setting up the Edgerton Center's infrastructure, recalled that she had made it clear internally that it was impossible for Spectrum to meet its schedule, because all of the necessary pieces were not in place at the time. *Id.* (in January 2017, the Edgerton Center did not have "shelves, employees, or any processes in place"). Because of the issues discussed below, Spectrum not only kept HHI's North Carolina distribution center open months longer than planned but also <u>never consolidated its California facility, which remains open to this day</u>.

Former Spectrum employees of many levels, from a Territory Account Manager to a Training Specialist, uniformly recalled that the HHI Consolidation was a complete fiasco:

***The HHI Consolidation Was Significantly Behind Schedule***. Spectrum's initial plan was for HHI's North Carolina and California distribution centers to close by December 2017, while HHI utilized the Edgerton Center for distributing all new inventory. ¶ 98. However, the Edgerton Center was not operational as planned and was unable to intake and distribute the volume of inventory being acquired on an ongoing basis. Thus, Spectrum delayed closing the other distribution centers and had to stock three distribution centers—rather than just the Edgerton Center, as planned. ¶¶ 97–98. The result was materially excess inventory across all HHI facilities and significant costs to Spectrum. *Id*.

***The Edgerton Center Failed to Install Infrastructure, Including a Racking System, on Schedule***. FE 11, a member of the Operations Team, recalled that when she visited the Edgerton Center in April 2017, only 5% of the 1,000,000-square-foot building was set up, and the facility was operating out of a trailer. ¶ 99. Like GAC, HHI failed to install a racking system in the Edgerton Center until 2018. Employees had to store inventory on the floor, which caused product damage, inventory mismanagement, and an inability to locate products to fill orders. ¶¶ 99-100. While Spectrum planned to have the Edgerton Center "operational" by May 2017, it had still not fully installed the racking system as of <u>November 2017</u>. ¶ 100.

Because Spectrum could not accurately and efficiently "pick" and load inventory for shipment, from the time the Center opened in spring 2017 and continuing through 2018, multiple semitrailers were lined up outside docking stations for hours, and many trailers filled with product were simply left in the employee parking lot. ¶ 102. In fact, Defendant Maura would later disclose that by March 2018, the Edgerton Center was at a "standstill" because 350 semitrailers were blocking inbound and outbound shipments. *Id*. Like the Dayton Center, the Edgerton Center soon began relying on additional warehouses to store overflow inventory. ¶ 104.

***The Edgerton Center's Inability to Hire a Qualified Workforce***. Spectrum was unable to hire, retain, and train a workforce capable of running a sophisticated distribution center that handled thousands of products. ¶ 126. The Edgerton Center suffered multiple integral comparative disadvantages. ¶¶ 126–28, 130. First, the Edgerton Center is 40 miles outside Kansas City with no public transportation available. ¶ 126. Second, the Edgerton Center paid significantly below-market wages. ¶ 127. Third, the employees at the Edgerton Center were poorly trained. Supervisors were given responsibilities they did not know how to execute, and warehouse workers were tasked with using power equipment they were not trained to operate. ¶ 130. Consequently, the Edgerton Center suffered "atrocious" employee attrition. ¶ 128.

### C.     The Botched Consolidations Negatively Affected Relationships with Major Retailers and Payments to Key Vendors.

The botched Consolidations materially harmed Spectrum's relationships with major business partners. As noted above, Spectrum's SLAs with Walmart, Lowes, and other customers specified minimum required fill rates and on-time delivery. Retailers enforced the SLAs by levying significant penalties or even repudiating the contracts for violations. ¶ 87. Spectrum closely monitored the GAC and HHI divisions' compliance with these terms. *Id*. Spectrum's disastrous execution of the Consolidations led to routine violations of its SLAs, with significant consequences. While, as Defendant Maura later admitted, these retailers required fill rates "in the high 90s," ¶ 87, the Edgerton Center's fill rates nosedived to 30% and were consistently 50–70% throughout 2017 and early 2018. ¶¶ 105–06. GAC similarly suffered from an inability to comply with governing SLAs, leading to numerous customer complaints and lost sales. ¶¶ 87–89.

As a result of the problems at the distribution centers, Spectrum was also chronically tardy in fulfilling orders for its clients. ¶ 116. For example, the Edgerton Center's lead times on orders ballooned from 7–10 days before the Consolidation, up to a 68-day <u>average</u> during the Class

Period. ¶ 118; *see also* ¶¶ 116–25. The delays at the Edgerton Center were so significant that Spectrum was $200 million behind in filling orders in May 2017, and Spectrum internally circulated a message at Middleton headquarters asking headquarters administrative employees to go to Edgerton to help clear the shipping bottleneck. ¶ 117. The difficulties continued through 2017 into 2018, eventually getting so bad that HHI had to conduct an "order flush," which entailed clearing the entire backlog of open orders and asking customers to place new orders for any items they still needed. ¶ 122. The "order flush" eliminated many previously booked orders that customers no longer wanted or needed, but it failed to reduce HHI's shipping backlog. *Id.*

Spectrum's chronic inability to achieve acceptable fill rates and timely delivery resulted in its customers' imposing millions of dollars in penalties on Spectrum and endangered Spectrum's relationships with Walmart and other major retailers and homebuilders. *See* ¶¶ 131–39. Walmart loudly complained about Spectrum's terrible fulfillment rates and shipping times and demanded personal attention to its concerns from Spectrum's top executives. ¶ 132. Spectrum's relationships with Lowe's and Home Depot similarly suffered. ¶ 133. Each retailer levied millions of dollars in penalties against Spectrum for violating the SLAs. ¶ 136. In addition to these penalties, Spectrum also lost valuable contracts as a direct result of the supply-chain disruptions caused by the Consolidations, including exclusivity agreements with Tractor Supply Co., a large retailer, and PulteGroup, Inc., the second-largest homebuilder in the country. ¶¶ 138–39.[4]

Just as these issues from the Consolidations plagued Spectrum's customer relationships, they also negatively affected its vendor relationships. Because Spectrum could not properly track

---

[4] Echoing the statements by Defendants Rouvé and Martin to investors, Spectrum executives internally told salespeople to tell their customers that the issues plaguing the supply chain were transitory and would get better soon; executives also told salespeople not to engage with customers about the specifics of the problems. *Id.*

the inventory it received from vendors, it could not pay those vendors for the inventory. ¶ 140–41. As a result, only 50–60% of GAC and HHI vendor payments were on time, with some unpaid invoices over a year old. ¶¶ 141, 143. Spectrum maintained an "exception list" of invoices that could not be reconciled even after investigation. ¶ 142. As of February 2018, there were 350 outstanding invoices on the exception list. *Id.* Accordingly, some vendors began refusing to ship to Spectrum at all, and vendors' threats to stop doing business with Spectrum due to nonpayment were reported "almost every single day." ¶¶ 144, 149. The Company's nonpayment issues were sufficiently severe to require both divisions' CFOs to personally intervene in order to force payments to key vendors to avoid those vendors refusing to work with Spectrum in the future. ¶ 149.

### D. Spectrum's Consolidation Challenges Were Not "Temporary."

*July 27, 2017*. Spectrum announced its third-quarter 2017 results, disclosing a year-over-year net-income decline of 25%. ¶ 200. The company blamed the shortfall on a "confluence of factors, some macro and others Company-specific." *Id.* Defendants conceded that some portion of the shortfall was due to "temporary, transitional supply chain challenges" at GAC and HHI. ¶ 201. But Defendants dispelled any concerns by claiming that the Dayton Center was "running really well," in "good shape," and about "<u>98%" complete</u>. ¶¶ 202–04. Defendants reiterated to the market that "both projects remain[ed] <u>on schedule</u>" and were making "good progress." *¶* 202.

### E. Defendants Claimed to Have Closed HHI's West Coast Facility When They Never Did, and it Remains Open to This Day.

*November 16, 2017*. Spectrum announced its fourth-quarter 2017 financial results. Defendant Rouvé returned to highlighting the "good progress" Spectrum was making on its "<u>2 transformational projects</u>," claiming that the GAC Consolidation was "now complete" and that the HHI Consolidation was "65% complete" and expected to be complete by March 2018. ¶ 218.

Specifically, Defendant Martin claimed, as evidence of the HHI Consolidation's "good progress," that Spectrum had "closed the West Coast distribution center successfully, and the East Coast facility will wind down soon." ¶ 219.

*February 8, 2018*. Spectrum announced its first-quarter 2018 results, again declaring the "major progress" it had made in the Consolidations. ¶ 224. Defendant Rouvé reiterated that the GAC Consolidation was "complete." *Id*. Defendant Rouvé also announced that the HHI Consolidation was "moving forward to completion as we exited our West Coast distribution center in November and will exit our East Coast distribution center in February." ¶ 225.

### F. Spectrum Fires Defendant Rouvé, as Defendants Are Forced to Admit Significant Problems in the Consolidations.

*April 26, 2018*. In late April 2018, Spectrum disclosed "very disappointing" financial results for the second quarter of 2018, driven by the "meaningfully greater than we expected" "challenges" at the Dayton and Edgerton Centers. ¶ 151. Among these very disappointing financial results was a 98% decrease in net income year-over-year. ¶ 153. Notably, Spectrum announced that Defendant Rouvé had been terminated from both his CEO and Director positions and was immediately being replaced by Defendant Maura as CEO. ¶ 155. Additionally, Spectrum announced that Guy Andrysick, President of GAC, was also terminated. *Id*. Defendant Martin said that the "biggest drivers" of Spectrum's negative results were "the major manufacturing and distribution center operating inefficiencies from HHI and Global Auto Care, which materially hampered our distribution capabilities in March." *Id*. Analysts immediately declared that Spectrum management had "lost credibility" and that the "ramp-up issues should have been fixed quarters ago." ¶ 159. As a result of this announcement, Spectrum's stock price decreased from $94.23 to $75.01, or 20%. ¶ 158.

Maura claimed that the Company had taken "swift and decisive action in recent weeks to steady the HHI and Global Auto Care facilities" and again stressed that these setbacks were "transitory." ¶¶ 161–62. Maura further attempted to assuage the market by representing that he personally was supervising the GAC and HHI Consolidation corrective measures: "while today is technically day 1 on the job for me, I've been traveling and probably haven't slept for 2 weeks," and "[I have] recently [been] . . . living between Dayton and Edgerton." ¶ 258.

*July 26, 2018*. By late July 2018, Maura was touting the corrective measures that the Company had taken and their corresponding financial results: "[Spectrum] [is] on [its] way and the business is rebounding, proving the issues [it] faced were indeed largely transitory." ¶ 169. Maura claimed that the turnaround at HHI was "remarkable," and that the results showed that "this one [distribution center] facility [model] is going to work." ¶ 172. The market again credited Spectrum management's statements. For example, Oppenheimer & Co. analysts wrote that "it appears new CEO David Maura has put the company's self-inflicted wounds in the rear-view mirror." ¶ 176.

*November 15, 2018*. Spectrum surprisingly announced that it had decided to sell GAC to Energizer Holdings Inc. for $1.25 billion—a discount to the $1.4 billion Spectrum had paid for GAC in 2015 and after Spectrum had invested tens of millions of additional dollars in the GAC Consolidation. ¶ 178. The transaction surprised the market, which believed that GAC had turned the corner now that its "supply chain issues [were] likely in the rear view." *Id*. As the market was soon to find out, however, GAC's issues were not in the rearview mirror.

*November 19, 2018*. On the final day of the Class Period, Spectrum disclosed another disastrous quarterly financial report, including a significant earnings-per-share ("EPS") miss of $0.79 relative to a $1.05 EPS estimate, or a 25% miss. ¶ 180. The Company reported -$82.1 million

GAC EBITDA, down $110 million from $27.9 million from the prior year's third quarter. *Id.*. Spectrum attributed GAC's EBITDA swing partially to "low-margin excess and obsolete inventory liquidation, lower volume related to greater-than-expected retailer inventory reductions, Dayton Plant inefficiencies, physical inventory adjustments and scrap relating to the facility consolidation projects . . . ." ¶ 181. Understandably, the market was shocked. During Spectrum's third-quarter earnings conference call, analysts asked, "what changed from 3 months ago?," and "what happened between the third and fourth quarter?" that caused the unexpected regression, when Spectrum previously promised that many of the issues noted above were "transitory"? ¶ 182. Defendant Maura told the analysts that the "Dayton facility [was] 75% of the way back to where it should be," more than a year after it was originally supposed to be completed. *Id.* Investors again sold off Spectrum stock, causing the Company's stock to decline from $59.35 per share on November 16, 2018 to $48.05 per share on November 19, 2018, or a 19% decrease, on abnormally high trading volume. ¶ 183.

Further, the market lost faith that Spectrum had put its serious integration issues behind it. For example, Deutsche Bank wrote that "at this point, given a lack of visibility and continuing 'one time' issues, it is apparent that there are underlying structural issues that will take time (we assume 12+ months) and investment dollars to resolve." ¶ 184. Similarly, in describing the sale of the GAC division to Energizer in late 2018, Bank of America Merrill Lynch wrote that "Auto [is] seemingly far from [on] steady footing . . . . [Energizer] is an adept integrator, but increasing leverage for the Global Auto Care acquisition adds notable risk to the near-term with the business still working through supply chain/integration issues." ¶ 185.

## III.   ARGUMENT

At the motion-to-dismiss stage, the Complaint need only contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,*

550 U.S. 544, 570, (2007). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court must construe all inferences in a light most favorable to Plaintiff, *Seidel v. Byron,* 2008 WL 4411541, at *2 (N.D. Ill. Sept. 26, 2008), and Defendants' Rule 12(b)(6) motion tests the sufficiency of the Complaint, not the merits of the case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).

### A.    The Complaint Adequately Alleges Materially False and Misleading Statements and Omissions.

Once corporate officials speak on a subject, they are required to disclose all material nonpublic information on that subject: "[i]f one speaks, he must speak the whole truth." *Stransky*, 51 F.3d at 1331; *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005) (when volunteering information, a company's disclosure "must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts . . . to the extent that the volunteered disclosure was misleading"); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) (once a party chooses to speak, it has a "duty to be both accurate and complete"); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) ("[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading").

An omitted fact is material, and therefore actionable under Rule 10b–5, when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

*Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1998). Under Federal Rule of Civil Procedure 9(b) and the PSLRA, Plaintiffs need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Alizadeh v. Tellabs, Inc.*, 2015 WL 557249, at *7 (N.D. Ill. Feb. 9, 2015). Even under the PSLRA and Rule 9(b), courts do "not require the pleading of detailed evidentiary matters." *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 987 (W.D. Wis. 2003). The relevant question is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"). The Complaint does just that.

The Complaint alleges that Defendants Spectrum, Rouvé, Maura, and Martin misled investors concerning the status of the Consolidations. Defendants' false and misleading statements fell into four periods as the Consolidations proceeded:

*January–June 2017.* In quarterly investor conference calls and at investor conferences during this period, Defendants repeatedly said that the GAC Consolidation was making "good progress," "progressing smoothly," and "on track." ¶¶ 186, 191, 194–97. Similarly, Defendants said during this period that HHI would "be fully shipping out of [the Edgerton Center] by the end of August," that the "new site [would be] operational in May 2017 and current sites [would be] fully exited by end of calendar 2017," and that the HHI Consolidation was "making good progress" and "on track." ¶¶ 190–91, 194–97. These statements were materially false and misleading because, *inter alia*, Spectrum was already significantly behind schedule in both Consolidations and neither Center was able to timely or correctly fill customer orders.

These statements are actionable. *See Tellabs III*, 513 F.3d at 705 (statements that demand for a product was "still going strong" and that company "should hit [its] full manufacturing capacity in May or June" were actionable); *Stransky*, 51 F.3d at 1334–36 (statements that products

"'were coming down on their cost curves,' and that the [products] 'were making progress toward their targets'" were actionable); *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1353 (N.D. Ga. 2018) (commercial distributor's assurances that "supply-chain execution" was "on track" was actionable); *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) (statements that company's "integration team [was] 'doing all the work' and 'an incredible job'" and that "the integration was 'good,' 'great,' 'gaining momentum,' and showing 'great progress'" were material and actionable because analysts focused on the integration efforts); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) (statement that integration activities were "on track" was actionable); *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 852 (N.D. Ill. 2009) (statement that company "currently anticipate[s] that [it] will be able to repay or refinance all of [its] debt on a timely basis" was actionable); *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (statement that product rollout was "on track" was actionable).

*July 2017–February 2018.* In July 2017, Spectrum announced disappointing quarterly results, and Defendant Rouvé stated that "we experienced <u>temporary, transitional</u> supply chain challenges with our HHI U.S. distribution center consolidation in Kansas and the GAC U.S. operating consolidation in Ohio that affected shipping levels in the <u>short term</u> and impacted sales by approximately $24 million . . . . However, both projects remain <u>on schedule</u> and the issues are being quickly addressed . . . ." ¶ 201. These and similar reassuring statements, ¶¶ 206, 213–15, 217–21, 233, were materially false and misleading because both Consolidations were behind schedule, and the actual problems were "underlying structural issues" that would continue to plague Spectrum through the end of the Class Period. *See HD Supply Holdings*, 341 F. Supp. 3d at 1358 (claim that supply chain disruptions and increased spending were "temporary" was

actionable); *Lionheart Partners, Inc. v. M-Wave, Inc.*, 923 F. Supp. 1085, 1089 (N.D. Ill. 1996) (statements that shipments were "already back on schedule" and that lower order levels were "temporary" are actionable).

On February 8, 2018, Defendant Rouvé falsely told investors that "the consolidation of our [HHI] distribution in Kansas is moving forward to a completion as <u>we exited our West Coast distribution center in November</u> and will exit our East Coast distribution center in February." ¶ 225; *see also* ¶ 172, 226 (same statement by Martin), ¶ 252 (HHI purportedly implemented "single D[istribution] C[enter] model versus HHI's historical 2 DC model"). This was false because the West Coast center never closed and remains open to this day as the principal distribution center for many of HHI's products. ¶¶ 96, 231–32. These statements are actionable. *See Tellabs I*, 437 F.3d at 598 (statement that a product was "available now" was "particular, specific, and according to the complaint, completely false. The plaintiffs have alleged with sufficient particularity that [the statement was] material and false.").

*April 2018—June 2018.* In connection with Spectrum's second-quarter 2018 financials, Defendants reported problems at the distribution centers but assured investors that the problems were largely resolved. Specifically, in the second-quarter 2018 press release issued on April 26, 2018, Defendant Maura said, "It is our firm belief that the current impact to our free cash flow is <u>mostly transitory</u> . . . ." ¶ 236. Maura further stated that the Dayton Center fill rate was "in the 90%" range. ¶ 240. These and similar reassurances, ¶¶ 237–39, were materially false and misleading because the problems described above were ongoing during this period and had not been effectively addressed, and the Dayton Center's fill rate was "nowhere near" 90% as of May 2018, ¶¶ 241–43. *See HD Supply*, 341 F. Supp. 3d at 1353–54; *Lionheart*, 923 F. Supp. at 1089.

*July 2018.* In July 2018, Spectrum reported better quarterly results, and Maura told investors that the Company "benefited from markedly reduced order backlogs in Kansas and Dayton," that the Company "continue[d] to improve the efficiency of the Kansas and Dayton facilities," and that with regard to the Dayton Center, "we are on our way and the business is rebounding, proving the issues we faced were indeed largely transitory." ¶ 244. These and other positive statements, ¶¶ 245–52, were materially false and misleading because the problems described above were ongoing and had not been resolved. ¶¶ 254–55. Moreover, Defendants falsely said that the HHI backlog was "created in March" 2018, when it had been building up for many months and, to the extent it ballooned in March, this was a result of Spectrum's cancelling all outstanding orders in February and forcing customers to place new orders. ¶ 253.

Defendants' statements about the supposed benefits of the Consolidations are actionable. *See Stransky*, 51 F.3d at 1335 (statements "that profit margins should improve" and that "costs of these engines continued to decline" were actionable because they were allegedly made without a reasonable basis); *Iles v. Swank*, 2006 WL 1806365, at *4 (N.D. Ill. June 28, 2006) ("[T]he dichotomy between the positive statements . . . and the alleged financial difficulties facing [defendant] raises a strong inference that his statements were made with the intent to deceive, manipulate or defraud. Similarly, the facts alleged indicate that the statements were not made in good faith or with a reasonable basis."); *Sequel Capital, LLC v. Rothman*, 2003 WL 22757758, at *11 (N.D. Ill. Nov. 20, 2003) (optimistic financial projections were actionable where plaintiffs alleged that "[d]efendants had knowledge of the losses" that took place while defendants were making the projections, so a "jury could find that [they] . . . lacked any reasonable basis).

In response, Defendants lodge a series of meritless arguments that should each be rejected.

### 1. The Complaint Alleges that Spectrum's Statements About Its Consolidation Projects Were False and Misleading When Made.

Defendants contend that the Complaint does not adequately allege the falsity of (1) statements concerning the progress of the Consolidations, including that the Consolidations were "on schedule," "on track," and "98% complete," and that HHI's West Coast distribution center was closed, and (2) statements claiming that the problems with the Consolidations were "temporary" and "transitory," because these statements were all supposedly in fact true. Dkt. 21, at 23–26. Defendants are wrong.[5]

First, Defendants' claims that the GAC Consolidation were "on schedule" and "on track" are directly rebutted by the simple fact that the implementation of the GAC Consolidation was secretly behind Spectrum's stated schedule by eight to nine months even by late 2017. ¶ 59. This alone renders Defendants' statements false. In combination with the myriad other fundamental (and undisclosed) structural problems Spectrum faced in completing the Consolidations on schedule, the Complaint far exceeds the requirements of Rule 9 to plead the falsity of these statements. Similarly, there can be no question now that Defendants' claims that the West Coast HHI distribution center was already closed, ¶¶ 90, 219,  225-26, 232, are equally false, because that center never closed and continues operating today, well after the end of the Class Period. ¶ 96. *Cf. Tellabs III*, 513 F.3d at 709 (holding that when senior management described a product as available that was not available for many months, the statement was "exceedingly unlikely" to be the "result of merely careless mistakes").

Defendants claim that certain statements are not actionable because they are purportedly technically true. Dkt. 21, at 23-26. First, Defendants defend Martin's statement made in March

---

[5] Defendants' arguments concerning safe-harbor protection and materiality are addressed below.

2017 that Spectrum was already "actually receiving product" in the Edgerton Center as support for his claim that HHI would be "fully shipping" out of Edgerton by the end of August 2017. ¶ 190. While Martin's claim may have been technically true—Edgerton did begin receiving product in March 2017, ¶193—the very delivery of this product immediately made it clear internally at Spectrum that the HHI Consolidation was a disaster and that the consolidation could not be completed by the end of August. *Id.* Similarly, Defendants argue that their claim in June 2017 that the Edgerton Center was "already operational" could not have misled investors, presumably because the Edgerton Center had opened its doors and was receiving product. ¶ 197. But the common understanding of "operational" is "ready for or in condition to undertake a destined function"[6]—which the Edgerton Center was not at that time, because it was not ready or in condition to undertake the most basic of distribution-center functions, such as tracking and storing inventory or shipping products with an acceptable fill rate. These statements are actionable. *See Stransky*, 51 F.3d at 1331 ("[i]f one speaks, he must speak the whole truth"); *McMahan*, 900 F.2d at 579 ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."); *SEC v. First Am. Bank & Trust Co.,* 481 F.2d 673, 678 (8th Cir. 1973) (Even "a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor . . . may properly . . . be considered a material misrepresentation.").

<u>Second</u>, Defendants argue that their characterization of the issues plaguing the Consolidations as "temporary" and "transitory" could not possibly be false because "both facilities were running at normal capacity by the end of 2018." Dkt. 21, at 26. This is simply untrue. By the end of 2018 (or a full year after many of Defendants' false statements), Spectrum had abandoned

---

[6] *Merriam-Webster's Collegiate Dictionary* 869 (11th ed. 2014).

the HHI and GAC Consolidations altogether. By Defendant Maura's own words, by the last day of the Class Period, when Spectrum had agreed to sell the GAC division to Energizer, "the Dayton facility [was only] 75% back to where it should [have been]."[7]

### 2. Defendant's False and Misleading Statements Are Not Protected by the PSLRA's Safe Harbor.

For a statement to fall under PSLRA's safe harbor, it must (1) be a forward-looking statement; (2) be accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward-looking statement; and (3) be made without actual knowledge that the statement is false or misleading. *See* 15 U.S.C. § 78u–5(c)(1). Many of the statements Defendants allege deserve safe harbor protection are either (1) "mixed present/future statements . . . not entitled to the safe harbor" or (2) statements made with actual knowledge as to their falsity, recklessness, or bad faith or without a reasonable basis. *Tellabs III*, 513 F.3d at 705. In any event, Spectrum's cautionary statements were not "meaningful" with respect to the facts that Defendants sought to conceal.

<u>First</u>, many of the statements Defendants describe as forward-looking are mixed present and future statements not entitled to safe-harbor protection under the PSLRA. In *Tellabs III*, the Seventh Circuit ruled that the statements that sales were "still going strong"; that "we should hit our full manufacturing capacity"; and that Defendants were "<u>on track</u>" to hit certain revenue targets were mixed present and future statements that were not entitled to safe-harbor protection. *Tellabs III*, 513 F.3d at 705; *see also Tellabs I*, 437 F.3d at 597–98. The Seventh Circuit has similarly held

---

[7] Defendants' reliance on their own statements for the truth of their statements is improper. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019) ("[I]t is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint. This admonition is, of course, consistent with the prohibition against resolving factual disputes at the pleading stage.").

that statements regarding "progress" are actionable as historical statements when they diverge from internal targets. *Stransky*, 51 F.3d at 1334-35 (statement "that the engines 'were making progress toward their targets'" was a "historical statement[]").[8]

Many of the statements Defendants attack as purely forward looking are mixed present and future statements under this Seventh Circuit law. For example, Defendant Martin stated on January 27, 2017 during Spectrum's 2016 fourth-quarter earnings call that the GAC Consolidation would "continue to help [Spectrum] with better managing inventories going forward." Dkt. 21, at 28; ¶¶ 186–87. During the same earnings call, Martin also highlighted the "good progress" of the GAC Consolidation and noted that "[Spectrum] [had] already seen a nice impact in that business." ¶¶ 186–87. Defendants' claim that Martin's statement that the GAC Consolidation would "continue" to help with managing inventories is a forward-looking statement is wrong. Dkt. 21, at 29. Whether the GAC Consolidation had already helped Spectrum "better manage inventory," whether Spectrum had "already seen a nice impact," and whether the GAC Consolidation was already making "good progress" are all present statements, not forward-looking statements. *See Tellabs III*, 513 F.3d at 705; *Stransky*, 51 F.3d at 1334. Plaintiff Exhibit 1 to the contemporaneously filed Declaration of Katherine Sinderson is a chart of the statements Defendants attack as forward looking that are actually entirely or partly statements of present or historical fact. *See* Dkt. 27.

Second, with respect to those statements that are arguably forward looking, those statements were not accompanied by "meaningful" cautionary language that disclosed the

---

[8] *See also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1148 (9th Cir. 2017) ("Where, as here, forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an 'important factor' of which investors should be made aware.").

"principal or important risks" facing Spectrum at the time of the statements. *Asher v. Baxter Int'l Inc.*, 377 F.3d727, 729 (7th Cir. 2004). Defendants' cautionary statements were broad, boilerplate disclaimers that warned of a vast universe of possible hypothetical factors that could affect Spectrum's future results. *See Tellabs I*, 437 F.3d at 599 (holding that "[w]ithout doubt, these generalized statements encompass Tellabs's troubles . . . [but] they also encompass a whole world of other possible contingencies"). For example, Spectrum's caution that "actual results or outcomes may differ materially from those express or implied herein," Dkt. 21, at 30, is an empty statement that provided no meaningful information to any investor.

Further, the cautionary language mentioned in Spectrum's Form 10-Ks did not disclose the risks that, at the time of the statements, were the important sources of variance. *See Asher*, 377 F.3d at 734. As in *Asher*, Defendants' cautionary language remained static over time even though Defendants were aware of significant and escalating operational issues plaguing the Consolidations. In fact, the language is identical to language Spectrum had recited for <u>years</u> before the Class Period and before the GAC and HHI Consolidations were ever contemplated. *See* Dkt. 27, Ex. 2. Even as the problems at the Edgerton and Dayton Centers escalated, Defendants did not alter their cautionary language to address these changes. *See supra* Section III.B. The fact that Defendants' cautionary language remained static from before the Class Period to beyond the Class Period, despite the changing risks, demonstrates that Spectrum did not adequately address the "principal or important" risks as those risks arose. *See Asher*, 377 F.3d at 734 (holding that unamended cautions repeated from before the class period "raise[d] the possibility . . . that [defendant] omitted important variables from the cautionary language and so made projections more certain than its internal estimates at the time warranted").

26

Finally, as discussed in Section 3.B, the Complaint adequately alleges that the individual Defendants knew their statements were false. *See Iles*, 2006 WL 1806365, at *4 ("the dichotomy between the positive statements . . . and the alleged financial difficulties facing [defendant] raises a strong inference that his statements were made with the intent to deceive, manipulate or defraud").

### 3. Defendants' Statements About the Consolidations Are Not Nonactionable Opinions.

Defendants assert that their statements that the Consolidations were "progressing smoothly," any issues were "temporary," any "startup issues" were "normal," and similar statements are opinions. Dkt. 21, at 33. Defendants are wrong; these are statements of current fact that were contradicted by undisclosed facts about the severe harm that the Consolidations were inflicting on GAC's and HHI's ability to promptly and accurately fill customer orders at the time the statements were made and the resulting damage to Spectrum's relationships with its most important customers. Moreover, these statements do not refer to "opinion," "belief," or any other terms indicating that they are opinions.[9]

---

[9] Defendants claim that "optimistic statements of progress" are treated "as statements of opinion" for the "purpose of Exchange Act liability." Dkt. 21, at 34. Defendants rely on *Tongue v. Sanofi*, 816 F.3d 199, 206 (2d. Cir. 2016), and *Perez v. Higher One Holdings, Inc.*, 2016 WL 6997160 (D. Conn. Sept. 13, 2016), to support this proposition. However, in *Tongue*, the Court held that the timing-related statements in that case did not conflict with information then known to defendants, which concerned a future decision by the FDA. *See Tongue*, 816 F.3d at 211. In fact, defendants in that case correctly predicted when the FDA would make its decision on the product. *See id.* at 213. Here, the timing-related statements were objectively incorrect because Defendants were aware that the GAC and HHI Consolidations were off schedule per the Company's own internal deadlines. *See Stransky*, 51 F.3d at 1334; *see also supra* Section III.B. Further, to the extent Defendants rely on *Perez* to support their proposition that statements of progress are statements of opinion as a matter of law, *Perez* directly conflicts with numerous cases in the Seventh Circuit. *See, e.g.*, *Tellabs III*, 513 F.3d at 705 (statement that demand for a product was "still going strong" and that company "should hit [its] full manufacturing capacity in May or June" were actionable); *TreeHouse Foods, Inc.*, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) (statement that company was "solidly on track to deliver the earnings" was actionable).

Even if any of these statements are deemed to be opinions, they are actionable. The Supreme Court held in *Omnicare* that an opinion statement is actionable if it contains a false statement of embedded fact; if the expressed opinion was not sincerely held; or—even if the opinion was sincerely held—if the statement "omits material facts about the issuer's inquiry into or knowledge concerning [the] statement" and the omitted facts show that the speaker "lacked the basis for making those statements that a reasonable investor would expect." 135 S. Ct. at 1329. Here, the purported opinion statements are actionable under all three prongs.

First, statements that the Consolidations were "progressing smoothly" and any startup issues were "normal" and temporary" necessarily implied the embedded facts that GAC and HHI were smoothly fulfilling customer orders and that management was effectively addressing the "issues." As discussed in detail in Section II.B, these embedded facts were false—both GAC and HHI were experiencing such low fill rates and long delays in filling customer orders that major customers were penalizing Spectrum and threatening to abandon it, vendors were not being paid and were threatening to stop supplying inventory, and the problems were not effectively addressed but rather remained severe throughout the Class Period.

Second, as discussed in Section III.B, the Complaint sufficiently alleges that the Executive Defendants were aware of the significant problems plaguing the GAC and HHI Consolidations. Thus, they could not have honestly believed that the Consolidations were "progressing smoothly" and any issues were "temporary." Indeed, it is absurd to suggest, Dkt. 21 at 38, that they honestly believed their outright falsehood that HHI's California distribution center had closed. Defendants' argument that Plaintiffs do not adequately allege Executive Defendants' lack of honest belief in their statements should be rejected. Dkt. 21, at 36.

<u>Third</u>, even if Defendants were not actually aware of <u>all</u> the details of the pervasive, persistent problems at each of the Centers, any reasonable inquiry would have informed them that the Centers were severely dysfunctional and that late, incomplete shipments from both Centers were inflicting serious harm on the Company's customer relationships. As the Supreme Court held in *Omnicare*, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1328. The Court gave the example of a "CEO, [who] in claiming that her company's TV had the highest resolution available on the market, had failed to review any of her competitors' product specifications." *Id.* at 1329 n.6. Thus, when Defendants made affirmative statements as to the "progress" of the Consolidations and the "transitory" nature of the issues affecting the consolidations, they misled investors by implying that they had conducted an appropriate investigation and had a reasonable basis for making the statements.

Defendants incorrectly assert that the Complaint does not provide any "metrics against which to compare [the] allegations" that HHI's and GAC's scrap rates and lack of racking deprived the purported opinions of any reasonable basis. Dkt. 21, at at 37. This is untrue:

- The Dayton and Edgerton Centers had no racks at all during much of the Class Period, whereas genuinely operational distribution centers are fully equipped with sophisticated racking that is tailored to the types of products being stored and distributed. ¶¶ 40, 65-70, 99-100, 102. A comparison of nothing to a complete set of equipment is a comparison of 0 to 100%.

- The Complaint alleges that most manufacturers have scrap rates under 2%, but the Dayton Center's scrap rate was 30%. ¶ 71.

- The Edgerton Center's fill rate was half of what it had been before the HHI Consolidation, HHI began shipping goods when fill rates were as low as 40%, and customers expected fill rates in the 90s. ¶¶ 111, 264.

- The Edgerton's lead time for filling orders went from 7–10 days pre-Consolidation to an average of 68 days after it. ¶¶ 118, 122.

- For both divisions, vendor invoices were paid before the Consolidations in accordance with their terms after 30–90 days, but this exploded to 3–8 <u>months</u> after the Consolidations. ¶ 143.

Defendants' opinion statements are actionable.[10]

### 4.    Defendants' Statements About the GAC and HHI Consolidations Were Not Puffery.

Materiality is a "mixed question of law and fact" that is inappropriate for determination on the pleadings. *See*, *e.g.*, *Marks v. CDW Comp. Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) ("[A] materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss."). A misleading statement is material for purposes of Rule 10b–5 if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Stransky*, 51 F.3d at 1332. Puffery describes "statements that the market recognizes as nonmaterial." *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 854 (N.D. Ill. 2009). Defendants ask this Court to determine as a matter of law that the vast majority of alleged false statements here were immaterial puffery. Defendants are wrong.

As an initial matter, many of the statements Defendants allege are puffery, such as those concerning the consolidations being "on track" and making "good progress," are historical, material statements of fact that cannot as a matter of law constitute puffery. *TreeHouse Foods*, 2018 WL 844420, at *3 (rejecting argument that defendants' claim to be "[s]olidly on track to deliver the earnings" was immaterial). Even if these statements were puffery (which they are not), the statements would be materially misleading because they failed to disclose the numerous

---

[10] Peculiarly, Defendants argue that "it is not enough to allege that Defendants' estimates proved wrong." Dkt. 21, at 38. None of the purported opinion statements are estimates.

operational issues plaguing the GAC and HHI Consolidations. *See, e.g.*, ¶¶ 187, 191-93; *see also Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *5 (E.D. Tex. Sept. 29, 2015) (finding statement that "supplier relationships remain as strong as ever" misleading because defendant omitted contrary facts).

The statements Defendants attack as immaterial were in fact highly material given that investors—and Defendants—recognized that successful execution of the "transformational" Consolidations was critical to Spectrum's financial future. *See HD Supply*, 341 F. Supp. 3d at 1347 ("[a]s a commercial distributor, [defendant's] <u>lifeblood is its supply chain</u>"); *SEC v. Ustian*, 229 F. Supp. 3d 739, 772 (N.D. Ill. 2017) (the "context" in which statements are made is "significant" and can "add concreteness to otherwise vague, inactionable statements"). Numerous courts have found these types of statements material. First, Defendants wrongly contend that Defendants' statements that the Consolidations were "on track" or "progressing smoothly" (Dkt. 21, at 40–41) were immaterial as a matter of law. Not so. *See, e.g.*, *HD Supply*, 341 F. Supp. 3d at 1353 (commercial distributor's assurances that "supply chain execution" was "on track" were actionable); *TreeHouse Foods*, 2018 WL 844420, at *3 (statement that company was "solidly on track to deliver the earnings" was actionable); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) (statement that integration activities were "on track" was actionable); *Desai*, 654 F. Supp. 2d at 852 (statement that company "currently anticipate[s] that [it] will be able to repay or refinance all of [its] debt on a timely basis" was actionable); *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (statement that product rollout was "on track" was actionable).[11]

---

[11] Defendants rely on *Central Laborers' Pension Fund v. SIRVA, Inc.*, 2006 WL 2787520, at *14 (N.D. Ill. Sept. 22, 2006), to incorrectly suggest that statements about the progress of the Consolidations are puffery. First, *SIRVA* actually supports Plaintiffs' allegations here. The court

Second, Defendants broadly assert that their statements regarding the "transitory" nature of the problems affecting the GAC and HHI Consolidation were statements that "no reasonable investor would rely on because they were so vague and indefinite about when and how the consolidation problems would be resolved." Dkt. 21, at 41. However, this is not true. The Complaint shows market reliance on Defendants' statements concerning the progress of the GAC and HHI Consolidations and on the "transitory" nature of the issues plaguing them, especially after Spectrum's first partial disclosure in April 2018. ¶¶ 51–52. In fact, <u>multiple</u> analyst questions and reports addressed precisely the statements at issue and the "temporariness" of the issues plaguing the GAC and HHI Consolidations. For example, an Oppenheimer & Co. analyst wrote after the 2018 second-quarter earnings call that "[o]verall, it appears new CEO David Maura has put the company's self-inflicted wounds in the rear-view mirror," regarding Defendant Maura's earlier statement that "the U.S. facility operating inefficiencies are transitory in nature and the adverse margin impact from them is temporary." ¶¶ 160, 176. Moreover, during the next earnings call analysts expressed shock that these allegedly "transitory" issues plaguing the GAC and HHI Consolidations were still, in fact, materially harming the Company's bottom line. ¶ 182. *See Tellabs I*, 437 F.3d at 597 (statement not puffery when made in response to analyst questions); *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods*, 2018 WL 844420, at *2 ("Representations

---

in *SIRVA* held that Defendants' progress-related statement that it was "quickly integrating and growing acquisitions" <u>was</u> material due to the company's alleged reliance on the operations at issue. *Id.* at 14. Similarly, Spectrum's Consolidations were of significant importance to investors. *See, e.g.*, ¶¶ 44, 51–52, 59. Other progress-related statements, which concerned "broadening [defendants'] services offering and expanding [its] presence," were of a substantially different type than those in this case, which deal with specific publicly announced projects and internal company deadlines, all of which Spectrum missed. *Id.* at 13. Further, *In Re Midway Games, Inc. Securities Litigation*, 332 F. Supp. 2d 1152 (N.D. Ill. 2004), is inapplicable because it concerned statements that contained no present elements, unlike the mixed present and future statements at issue here. *See id.* at 1163–64.

about the integration efforts and performance would . . . have a profound significance to investors" where "numerous analyst reports show that sophisticated investors did in fact consider these representations significant.").[12]

Third, Defendants attack two alleged false statements that express "enthusiasm about the positive impacts the consolidation had on Spectrum's business," including the statement that the Company saw a "nice impact in that business" regarding the GAC Consolidation and that the GAC Consolidation was "in good shape." Dkt. 21, at 42. These statements are material and actionable. *See TreeHouse Foods*, 2018 WL 844420, at *2 ("[C]omments about how the integration was

---

[12] Defendants' reliance on *Fulton City Employees' Retirement System v. MGIC Investment Corp.*, 675 F.3d 1047 (7th Cir. 2012), is misplaced. In that case involving a mortgage lender, plaintiffs challenged defendants' statement that the company had "substantial liquidity," but the company actually had "a lot of money" "both absolutely . . . and relative to the needs of [its] business," and defendants "detail[ed] problems [the company] was encountering, including the liquidity risk . . . ." Thus, *MGIC* is not a puffery case but rather a case where defendants' statements were true and any risk was fully disclosed, unlike the concealment of the Consolidations' risks here. *Fulton*, 675 F.3d at 1049-50. Defendants' reliance on *Searles v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995), is also misplaced. The "indefinite predictions of growth" described in *Searles* (i.e., "recession-proof") are different than the statements at issue here, which addressed specific issues plaguing Spectrum. In addition, *Searles* acknowledges *Stransky*, which held that progress-related statements can be actionable as a matter of law. *See id.* (citing 51 F.3d at 1333). Further, the Complaint shows that the market considered Defendants "transitory" comments material. *See* Section III.A.4. Similarly, *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 941 (N.D. Ill. 2015), is not on point, as the statement that a company's products are "going to be . . . large and successful" is not analogous to describing a foundational issue with a company's key business consolidation as "transitory." And to the extent Defendants cite *Plymouth Cty. Ret. Ass'n v. Advisory Bd. Co.*, 370 F. Supp. 3d 60, 81 (D.D.C. 2019), to suggest that a company's statement that it was "making good progress" is puffery as a matter of law, this directly conflicts with Seventh Circuit law on similar statements. *See, e.g.*, *Tellabs III*, 513 F.3d at 705, 709 (statement that demand for a product was "still going strong" and company "should hit [its] full manufacturing capacity in May or June" were actionable); *Stransky*, 51 F.3d at 1334–36 (statements that products "'were coming down on their cost curves'" and that the "[products] 'were making progress toward their targets'" were actionable).

'good,' 'great,' 'showing great progress' were statements [such] 'that reasonable investors . . . could believe there was a factual basis.'").[13]

Finally, even if the Court were to find that any of the false statements are puffery, the statements are still actionable because Defendants were aware that the statements were deceptive and omitted material facts that rendered the statements materially misleading. *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1027–28 (N.D. Ill. 2010) ("statements that would otherwise amount to puffery can be actionable if the speaker is aware that the statement is deceptive"); *Marcus*, 2015 WL 5766870, at *5 ("Even if these statements were looked upon as mere 'puffery' . . . that does not negate the duty to disclose other information necessary to make those statements not misleading.").

### B.   The Complaint Pleads a Strong Inference of Scienter.

To plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u–4(b)(2). Scienter is adequately pleaded by demonstrating that a defendant knowingly made a false statement or recklessly disregarded "a substantial risk that it was false." *Tellabs III*, 513 F.3d at 704. A strong inference of scienter arises if, "when the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any

---

[13] In support of this argument, Defendants rely on *Plumbers & Pipefitters Local Union No. 630 Pension Annuity Trust Fund. v. Allscripts-Misys Healthcare Solutions, Inc*., 778 F. Supp. 2d 858 (N.D. Ill. 2011). Dkt. 21, at 42. But the statements in *Plumbers* were broad optimistic statements about the general financial performance of the company, such as that it was "confiden[t] in [its] ability to deliver solid results." *Id.* at 872. The statements here are about specific critical projects that were expected to have specific results and were material to the market. Defendants also miss the mark with *Eisenstadt v. Centel Corp*., 113 F.3d 738, 746 (7th Cir. 1997). In *Eisenstadt*, the court ruled that defendants lacked any means to know that the company's auction would go poorly. Here, the Complaint alleges that Defendants had ample, contemporaneous information known to them to render their statements about the Consolidations false and misleading. *See* Section III.B.

opposing inference . . . ." *Tellabs II*, 551 U.S. at 326. Thus, "*Tellabs* now awards the draw to the plaintiff." *ACA Fin. Guar. Corp.*, 512 F.3d at 59. Finally, "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs II*, 551 U.S. at 324. Here, Spectrum and the Executive Defendants made material misstatements and omissions with, at a minimum, severe recklessness.

Plaintiffs have alleged numerous facts supporting a strong inference of scienter. As discussed in detail below:

- Defendants Martin, Rouvé, and Maura were all informed of adverse facts about problems caused by the Consolidations that contradicted their public statements, ¶¶ 259, 262;

- Senior executives reporting directly to the Executive Defendants were informed of additional adverse facts contradicting Defendants' public statements, such that the only plausible inference is that the Executive Defendants were also informed of these facts or at least reckless in not checking the facts, ¶¶ 260–61, 263–69;

- GAC and HHI were core operations of Spectrum, accounting for 34% of net sales in 2017 and 59% of net sales in 2018, strengthening the inference that the Executive Defendants knew or recklessly disregarded the undisclosed facts about these operations, ¶ 276;

- Spectrum's three largest customers, Walmart, Lowe's, and Home Depot, threatened to leave Spectrum and fined or penalized the Company millions of dollars because of late and incorrect shipments, and other major customers also threatened to leave or curtailed their purchases from Spectrum, ¶ 272;

- Defendant Rouvé and the President of GAC were terminated in April 2018 in conjunction with Spectrum's partial acknowledgement of the severe problems with the Consolidations, ¶¶ 273–74;

- The Executive Defendants repeatedly spoke to investors about the importance of the Consolidations, and when they partly disclosed problems with the Consolidations, repeatedly reassured investors that the problems were "temporary" and were being effectively addressed, ¶¶ 278–79; and

- The problems at both distribution centers were so massive, widely known within the Company, and obvious that the Executive Defendants either knew or were reckless in not knowing about them, ¶ 279.

35

Viewed holistically, as required by *Tellabs II*, these allegations support a strong inference that the Executive Defendants were at least severely reckless in making their alleged false statements. And their scienter is attributable to Spectrum, whose corporate scienter is also adequately alleged based on the enormity of the fraud. As Judge Posner wrote in *Tellabs III*,

> The critical question . . . is how likely it is that the allegedly false statements . . . were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading.

513 F.3d at 709. Judge Posner went on to find the "careless mistakes" inference was "exceedingly unlikely" where the products at issue were the company's "most important products." *Id.*; *see also Silverman*, 2008 WL 4360648, at *14 ("[I]t is almost inconceivable that these defendants were not aware of the production problems faced by the significant new product launch. . . ."); *Desai*, 654 F. Supp. at 860 ("Individual positions of authority within a company may still have relevance to the scienter inquiry if that inquiry focuses on whether the plaintiffs have succeeded in creating 'a strong inference of scienter with respect to each individual defendant,'" and "a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue."). Likewise, here it is exceedingly unlikely that the top management responsible for Spectrum's public statements—the Executive Defendants—were merely careless and not at least reckless in publicly misrepresenting the status and impact of the Company's two "transformational" Consolidations.

### 1.    The Executive Defendants Personally Received Reports That Contradicted Their Public Statements.

The Executive Defendants personally received reports and were on calls or in meetings regarding the problems caused by the Consolidations, and Defendant Rouvé saw the problems at the Dayton Center firsthand. FE 18 (Senior Accountant) stated that she knew that her boss presented reports about the financial impact of the problems to the C-suite, including Defendants

Martin, Rouvé, and Maura. ¶ 259. These reports showed that 40–50% of payments to vendors were late because of GAC's and HHI's inability to track their inventory and that vendors were threatening to stop servicing the distribution centers. *Id.* FE 18's director would brief Martin directly on the significant problems with backlogged vendor bills (which at one point totaled nearly $1 million), particularly when larger vendors that serviced multiple business units were threatening to stop servicing Spectrum. *Id.* FE 18 also knew that the GAC and HHI division CFOs were separately escalating these problems to Martin because Martin would ask her or her director questions about payments to specific vendors. *Id.*; *see also* ¶ 266 (Steven Siguenza, HHI Assistant Controller, and Lannie Scoggins, Director of Global Financial Planning and Analysis/Controller, also received an "exception list" of vendor invoices).

FE 12 recalled that Rouvé listened in telephonically to an Edgerton Center meeting between November 2017 and February 2018 concerning the need to reduce shipping times, which were weeks to several <u>months</u> delayed. ¶ 262. Further, Rouvé in 2017 and again in 2018 visited the Dayton Center, where the problems were in plain sight, including (i) a lack of racking; (ii) boxes of inventory that were crushed sitting on top of each other; (iii) large piles of scrap material, including dirty or damaged product; (iv) trailers full of crushed product; and (v) dozens of trucks lined up to deliver or pick up inventory and trailers left in the employee parking lot. ¶ 261.[14]

---

[14] FE 18's and FE 12's personal knowledge of and participation in communications with the Executive Defendants about undisclosed adverse impacts of the Consolidations distinguish this case from *Plumbers & Pipefitters Local Union v. Zimmer*, 673 F. Supp. 2d 718 (S.D. Ind. 2009), where the complaint "[did] not specify any contact or communication between any confidential witness and any of the Defendants" or "include any allegation that any individual Defendant had been actually aware of any material information." *Id*. at 747. Moreover, the *Zimmer* plaintiff did not allege that the products at issue in that case were "'critical' to Zimmer's 'core operations,'" *id.*, unlike here (*see infra* at 48). Similarly, *In re Harley-Davidson, Inc. Securities Litigation*, 660 F. Supp. 2d 969 (E.D. Wis. 2009) is off point, where "the Complaint [did] not charge that each defendant actually received and reviewed the statistical information said to be in the reports prior to making their allegedly misleading public statements" or that the defendants actually attended

By Defendant Maura's own admission, he was personally responsible beginning in April 2018 for instituting corrections to address the problems at the Dayton Center and the Edgerton Center. He stated that, under his new leadership, Spectrum had taken "swift and decisive action in recent weeks" with "aggressive oversight" over the Centers. ¶ 258. Further, he stated that "while today is technically day 1 on the job for me, I've been traveling and probably haven't slept for 2 weeks" and that he had been "recently . . . living between Dayton and Edgerton." *Id.*[15]

Thus, all three Executive Defendants were personally informed of the dire problems caused by the Consolidations of both GAC and HHI. *See Tellabs III*, 513 F.3d at 704 ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk."); *Roth v. Aon Corp.*, 2008 WL 656069, at *5 (N.D. Ill. Mar. 7, 2008) (finding scienter where defendants were not "passive bystanders, but instead had an intimate knowledge of . . . business operations, performance, [and] financial results"); *Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *23 (N.D. Ill. Sept. 21, 2005) (a "classic fact pattern giving rise to a strong inference of scienter" is when a defendant makes a statement while having "access to facts suggesting that the statement is inaccurate, misleading, or incomplete"); *Lionheart*, 923 F. Supp. at 1089 (N.D. Ill. 1996) ("Here, the complaint alleges that defendants knew and/or were reckless in not knowing that the statements they made were materially false and misleading. Plaintiff alleges that, contrary to defendants' August 8 statement, shipments to Motorola were not back on

---

any meetings at which the information was discussed. *Id.* at 999, cited in Dkt. 21, at 18-19; *see also Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017) (plaintiff did not allege that internal reports contradicted defendants' public statements), cited in Dkt. 21, at 19.

[15] Defendants oddly and erroneously assert that "Lead Plaintiffs appear to contend . . . that the Court should infer that Maura had complete knowledge many months earlier [than he became CEO] of any purported issues at those facilities . . . ." Dkt. 21, at 20. Plaintiffs do not allege Maura's scienter for statements made by others before he became CEO, but by his own admission he had become intimately involved in addressing the Consolidations' problems before he made his first allegedly false public statements on April 26, 2018. ¶¶ 236, 258.

schedule. If this is true, it can be inferred that defendants knew that information or were reckless in not knowing it.").

### 2. The Executive Defendants' Direct Reports Were Intimately Involved In Addressing the Significant Problems With the Consolidations.

Senior management at the Centers, many of whom reported directly to the Executive Defendants, were acutely aware of the problems with production, storage, and shipping at the Centers. Given the seriousness of the problems, the vital importance of the Consolidations to Spectrum, and Defendants' personal repeated statements about the status of the Consolidations, the only reasonable inference is that the problems were reported to the Executive Defendants or that the Executive Defendants were at least reckless in not inquiring of their direct reports before making repeated false public statements about the Consolidations. *See Tellabs III*, 513 F.3d at 709 ("That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's "flagship product"] knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity.").

With regard to the Dayton Center, FE 3 stated that KPIs including (1) the amount of damaged products at Dayton, (2) numbers and types of customer complaints, and (3) the production lines' first-pass rates (or how many items are manufactured without problems) were reported at monthly meetings attended by Stephen Keller, Senior Director, US Manufacturing at Spectrum Brands (who reported to Guy Andrysick, the President of GAC until his termination in April 2018, and then Randy Lewis, who took over GAC in April 2018), and Ken Burns, Spectrum's Vice President of Operations from August 2015 to April 2019 (who also reported to Andrysick and then to Lewis). ¶ 260; *see also* ¶ 265 (Maura acknowledging Keller as "one of our best operators" who had "taken over running" the Dayton Center); ¶ 260 (Andrysick regularly visited

the Dayton Center, where storage and production problems would have been obvious). Burns and Keller then had separate meetings with Company executives from Middleton headquarters to discuss these presentations, several of which meetings FE 3 personally attended. ¶ 68.

FE 1 confirmed that Burns was aware of the delays in setting up the production lines at the Dayton Center. ¶ 265. FE 3 also confirmed that she raised employees' inability to locate inventory with Brian Cartwright, Senior Director of R&D, who brought the issue to Burns and Keller. *Id.* Similarly, FE 2 stated that Mary Michael, Spectrum's Operations Manager from July 2016 to March 2019 who reported to Burns and then Keller, was deeply concerned with the significant downtime on the production lines. *Id.* Thus, senior executives who reported to the Executive Defendants were aware of the Dayton Center's serious problems both before and after April 2018.

With regard to the Edgerton Center, numerous former employees confirmed that the problems with late shipments and customer fines or penalties were well known throughout senior management at the Center. For example, the Edgerton Center's order-fulfillment problems became so dire that personnel from Spectrum headquarters were sent to help pack boxes in May 2017, which could not have happened without top Spectrum management's knowledge and approval. ¶ 264. FE 12 recalled an "all-hands" meeting around the end of February 2018 involving Shawn Simmons, Vice President of Human Resources, who reported to HHI's General Manager, at which it was discussed that close to 300 trailers were on the property waiting to be unloaded. *Id.* By February 2018, the Edgerton Center's order backlog was so severe that HHI "flushed" the entire backlog and required all customers to place new orders, which also could not have happened without top Spectrum executives' knowledge and approval. *Id.*

Members of senior management from headquarters in Middleton were also directly involved in troubleshooting many of HHI's distribution-center issues. For example, FE 8 stated

that she participated in quite a few monthly status meetings with Phil Gaebler, Vice President of Business Improvement and Global Supply Management, and HHI's General Manager (who reported directly to Defendants Rouvé and Maura), both of whom were explicitly briefed on the numerous issues plaguing the Edgerton center, including significant challenges in hiring staff and receiving product and delays in shipping. ¶ 267. Indeed, former employees reported that HHI's General Manager first instructed account managers to mislead customers with respect to fill rates and later participated in customer calls himself. ¶ 268.

It is not plausible that these myriad members of senior management at both headquarters and the Centers would be directly engaged in addressing the highly material and concerning production, inventory, and shipping problems at the Centers, and yet none of these problems would have been reported to Rouvé, Maura, and Martin. This is particularly the case because, as discussed below, the consolidation into the Centers was of paramount importance to the Company's financial position during the Class Period.

### 3. The Consolidations Were a "Transformational" Initiative and Were Critically Important to the Company.

The Executive Defendants publicly recognized the critical strategic importance of the Consolidations. For example, the Company told investors in its annual and quarterly SEC filings throughout the Class Period that "[w]e have undertaken various initiatives to reduce manufacturing and operating costs . . . the most significant of these initiatives are the GAC Business Rationalization Initiative . . . and the HHI Distribution Center Consolidation." ¶ 275. In the middle of the Class Period, Defendant Rouvé described the Consolidations as "major transformational projects, which will allow us to operate much more efficiently." ¶ 202. Moreover, GAC and HHI were significant divisions within Spectrum (accounting for almost 60% of Spectrum's net sales in 2018, ¶276), and the Consolidations were core to the operations of these divisions.

Given the financial importance of the Consolidations to Spectrum's financial well-being and attractiveness to investors, the Executive Defendants can be presumed to know of facts critical to Spectrum's core operations or to its important transactions. *See Tellabs III*, 513 F.3d at 709 (finding scienter pleaded where device at issue was a "flagship" product); *Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 662 (N.D. Ill. 2015) (finding scienter pleaded where meetings and reports discussed issue critical to core operations); *Shenk v. Karmazin*, 867 F. Supp. 2d 379, 387 (S.D.N.Y. 2011) (finding scienter pleaded where defendants made statements that "concerned major transactions or touched upon the heart of their companies' businesses"); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 974 (S.D. Ind. 2007) (officers are assumed to know facts "critical to a business's core operations or to an important transaction that would affect a company's performance").

### 4.   Spectrum's Largest Customers Threatened to Leave and Levied Penalties of Millions of Dollars Due to the Consolidations' Failures.

Spectrum's largest customers, Walmart, Lowe's, and Home Depot, making up nearly 40% of the Company's net sales across all divisions, threatened to leave Spectrum and penalized the Company millions of dollars due to late, incorrect, or partial shipments. ¶ 272. Numerous former employees quoted in the Complaint confirm that the Centers' dysfunctionality eroded the business relationships between Spectrum and its three largest customers. ¶¶ 131–36, 272. These customer's frustrations were consistent enough that all three threatened to leave Spectrum during the Class Period and levied massive penalties, in the millions of dollars, on Spectrum for late or incorrect shipments. ¶ 272.

Senior management who reported directly to the Executive Defendants or to others in the C-suite were aware of and discussed the millions of dollars in customer penalties and customers' threats to leave Spectrum due to delayed shipping and inadequate fill rates. For example, at

Walmart's demand, the Special Advisor to Spectrum's COO and Spectrum's VP of Sales and Marketing flew from Spectrum's headquarters to Arkansas to discuss Walmart's various complaints about Spectrum's order fulfillment in late 2017 and again in early 2018. ¶ 270. FE 11 stated that she participated in meetings with Senior Vice President David Booher (who reported to HHI's General Manager, who in turn reported to Rouvé and then Maura), where they discussed these penalties and threats to leave. *Id.* FE 12 similarly discussed with Booher in January 2018 that Home Depot was considering dropping Spectrum as a supplier because of Spectrum's inability to fill shipments in a timely manner. *Id.* Similarly, FE 4 explained that there were monthly "Tier Meetings" involving senior leadership at the Dayton Center that were led by either Ken Burns or Vice President of Finance Jim Garvey, who reported to GAC's CFO, and were attended by all directors, managers, supply planners, and quality-control employees. *Id.* At these meetings, participants repeatedly discussed that Walmart might leave Spectrum because Spectrum was so far behind on its shipments. *Id.*

Similarly, according to FE 14, the Edgerton Center's dysfunctionality was the direct cause of HHI losing its exclusivity contract with Tractor Supply, a significant customer, in 2018. ¶ 272. The Edgerton Center's order-fulfillment problems also seriously hurt Spectrum's relationships with the major homebuilders D.R. Horton, David Weekley, Toll Brothers, and PulteGroup. *Id.* Pulte, the second-largest homebuilder in the country, cancelled a four-year contract with Spectrum because of the Edgerton Center's late, inaccurate, and damaged shipments. *Id.*

Thus, the GAC and HHI Consolidation problems seriously jeopardized Spectrum's relationships with major customers representing the entire Company's core offerings for all of its divisions. It strains credulity to claim that the Executive Defendants were not informed that Walmart, Lowe's, Home Depot, and other major customers were threatening to leave and

collecting millions of dollars in penalties. *Cf. Sutton v. Bernard*, 2001 WL 897593, at *7 (N.D. Ill. Aug. 9, 2001) (finding scienter where defendants were aware of "numerous customer complaints" and "problems retaining existing customers and obtaining new customers").

### 5.   Spectrum's Firing of Rouvé Supports His Scienter.

Defendant Rouvé's scienter is further supported by his termination. Specifically, Spectrum announced on April 26, 2018, simultaneous with its report of significant problems in the consolidation of the distribution centers, that Rouvé was <u>immediately</u> and involuntarily stepping down both as CEO and as a Director on Spectrum's Board. ¶ 273. Courts in the Seventh Circuit recognize that an executive's termination or resignation, either under suspicious circumstances or in combination with other scienter allegations, supports a strong inference of scienter. *See In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("Further reinforcing the case for scienter is the allegation that Dick resigned in the wake of the restatement, before a replacement CFO was selected."); *United Union Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Great Lakes Dredge & Dock Corp.*, 2014 WL 12780549, at *3 (N.D. Ill. Oct. 21, 2014) ("what reasonable inferences to draw from the silence and the timing of Defendant Biemeck's unembellished resignation, after discovery on the issue, will be for a jury to determine at trial"); *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012) ("given the complaint's additional allegations regarding McCullough's knowledge of improper practices, the timing of his resignation lends weight to a finding of scienter").[16]

---

[16] *See also In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 n. 84 (S.D.N.Y. 2014) (finding executive's resignation shortly after undisclosed tax liability became public supportive of scienter); *In re Par Pharm. Sec. Litig.*, 2009 WL 3234273, at *10 (D.N.J. Sept. 30, 2009) (sudden resignation before fraud was revealed contributed to inference of scienter); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (same); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (same).

Further, on the same day that it announced Defendant Rouvé's firing, Spectrum announced the termination of Guy Andrysick, the President of GAC, who had been intimately involved in the Dayton Center consolidation. ¶ 274. As noted above, Andrysick visited the Center at least once a quarter. *Id*. This simultaneous termination of yet another senior executive who was active in the Dayton Center consolidation is further support for an inference of scienter.

### 6. Defendants' Frequent Discussion of the Consolidations Strongly Supports Their Scienter

The Executive Defendants spoke repeatedly and extensively to investors about the subject matters of the fraud—specifically, the progress of the Consolidations, the completeness of the distribution centers, the distribution centers' fill rates, the backlogs of orders, the "temporary," "transitional," or "transitory" nature of problems at the distribution centers, and the Company's progress in correcting the problems. ¶¶ 277–78. Moreover, the problems in the distribution centers were areas of intense market concern, and analysts repeatedly asked the Executive Defendants about the extent and origin of the problems. ¶ 278. The Executive Defendants either spoke on these subjects with knowledge of the topics, making their statements knowingly false, or failed to investigate or inquire as to the true facts underlying their statements, making their statements recklessly false. *Id*. Courts routinely find that repeated misstatements and false denials of problems are powerful evidence of scienter. *See Tellabs III*, 513 F.3d at 709 (repeated misstatements on a topic support scienter); *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at \*5 (N.D. Ill. Feb. 27, 2018) (finding scienter where defendant "played an active role in earnings calls, during which he assured investors that the increased claims frequency was due

to external facts" aside from undisclosed reduction in underwriting standards); *Schleicher*, 529 F.

Supp. 2d at 974; *Navistar*, 114 F. Supp. 3d at 662.[17]

### 7. The Problems Were Internally Well Known, Pervasive, Longstanding, and Highly Material.

Numerous former employees corroborated the existence of widespread problems with the

consolidation of the HHI and GAC distribution centers, including with inventory production,

storage, and shipment; employee hiring, training, and retention; and customer attrition. *See, e.g.*,

¶¶ 61, 63, 67-68, 76, 84, 93, 98, 103, 107, 110, 119, 122-24, 126-28, 132, 279. Thus, the problems

were so serious, so obvious, and so widely known within the Company that the Executive

Defendants either knew or were reckless in not knowing about them. Indeed, numerous former

employees in various roles at both the Edgerton Center and the Dayton Center corroborated that

the Company failed to plan for or set up racks for inventory storage, such that inventory was sitting

in stacked boxes, resulting in inventory damage, ¶¶ 67–70, 86, 99–101, 279; production lines were

delayed or inoperable resulting in a high percentage of scrap or unusable product, ¶¶ 58–62, 71–

76, 279; inventory-management systems were problematic, and employees could not locate

inventory, ¶¶ 65, 79, 82-83, 279; fill rates were far below those before the Consolidations, ¶¶ 87,

105, 264, 279; and both the Dayton Center and the Edgerton Center had to rent outside warehouse

space to hold excess inventory, a major expense that presumably required approval by the top

---

[17] See also *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x. 10, 14 & n. 3 (2d Cir. 2011) (finding scienter pleaded where subject of fraud was "key to measuring . . . performance and . . . a subject about which investors and analysts often inquired"); *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (finding scienter pleaded where fraud concerned "a subject about which investors and analysts often inquired," which "reinforces the inference of scienter"); *cf. Bach v. Amedisys, Inc.*, 2016 WL 4443177, at *9 (M.D. La. Aug. 19, 2016) (finding scienter pleaded where defendant was publicly confronted by fraud allegations and denied them); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 715–16 (W.D. Tex. 2010) (defendants were "confronted by the financial media with evidence of their false statements but continued to deny the allegations").

corporate management, ¶¶ 86, 104, 279. That these issues affecting the Company's core operations were widespread and corroborated by numerous former employees is further evidence that the Executive Defendants knew or were reckless in not knowing that their statements regarding the progress of the Consolidations and of the correction of purportedly "temporary" operational issues were false and misleading.

### 8. Defendants Do Not Offer a Compelling Competing Inference of Scienter.

In response to these allegations, Defendants do not offer a competing inference of scienter. Instead, Defendants merely attempt to poke holes in the Complaint's allegations. First, Defendants assert that the former employees cited in support of Plaintiffs' scienter allegations are inadequate. In fact, these sources amply satisfy the Seventh Circuit standard for reliable confidential sources:

> The confidential sources listed in the complaint in this case . . . are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify . . . . The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources.

*Tellabs III*, 513 F.3d at 712. For example, FE 18 was Spectrum's Accounts Payable Manager in its Middleton headquarters from February 2018 and May 2019 and was in a position to have first-hand knowledge that: the Company was unable to pay GAC's and HHI's vendors; that her boss presented reports about the financial impact of the problems to Defendants Martin, Rouvé, and Maura and briefed Defendant Martin on these issues; and that Martin asked her and her boss about these issues. ¶ 140 & n.33, ¶147. FE 12 was a Training Specialist at Edgerton from November 2017 to March 2018, ¶ 100 & n.25, attended large weekly meetings of senior facility personnel from November 2017 until February 2018, ¶ 137, and was in a position to know that Defendant Rouvé listened in telephonically to an Edgerton meeting during those months concerning the need

to reduce weeks- and months-long shipping delays, ¶ 262. Each of the other former employees quoted in the Complaint was similarly in a position to know the information they provided.[18]

Second, Defendants argue that their disclosure during the Class Period of the existence of some problems with the Consolidations negates the inference of scienter. As discussed above in Section III.A.3, however, the disclosures cited by Defendants were themselves materially false and misleading because Defendants falsely reassured investors that the problems were "transitory" and that the Consolidations remained "on track." These facts distinguish this case from *I.B.E.W. Local 697 Pension Fund v. Limited Brands, Inc.*, 788 F. Supp. 2d 609 (S.D. Ohio 2011), where the defendants announced problems at a new distribution center just one day after the start of the class period and repeatedly thereafter throughout the class period. *See id.* at 613, 630. Moreover, just ten weeks into the class period, Limited Brands announced that the problems were so serious that it had taken steps to deliberately reduce customer demand, including distributing fewer catalogs. *See id.* at 621, 630. And "the information provided to investors about the distribution center was not necessarily inconsistent with the alleged internal information, just less detailed than Plaintiff apparently would have liked." *Id.* at 631. Here, Defendants falsely downplayed the problems with the Consolidations, reassured investors that the problems were being effectively addressed, and

---

[18] Defendants cite *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2012 WL 1068761, at *3 (N.D. Ill. Mar. 29, 2012), for the proposition that the Seventh Circuit "has expressed a healthy skepticism" regarding confidential sources. Dkt. 21, at 15. However, in *Anixter*, "the information provided by the CWs [was] not inconsistent with Defendants' disclosures." 2012 WL 1068761 at *13. Here, by contrast, the former employees provided information that contradicts Defendants' positive statements about the Consolidations. Moreover, the Seventh Circuit explained in *Tellabs III* that the skeptical language about confidential sources in *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756–57 (7th Cir. 2007), related to the facts of that case, where the fraud occurred at a foreign subsidiary that concealed the fraud from the parent company, and the sources did not support an inference that the subsidiary failed to conceal the fraud from the parent. *See* 513 F.3d at 711–12. Here, by contrast, the undisclosed adverse facts were reported to the Executive Defendants.

concealed information demonstrating the problems' seriousness, unlike the "honest and frank behavior" in *Limited Brands*. *Id.*

Finally, Defendants broadly claim that it would be "completely irrational" for Spectrum to buy back stock if its management knew that their false statements would "lead to a stock price drop." Dkt. 21 at 22. But "irrational" fraud is just as actionable as "rational" fraud. Judge Posner rejected a similar argument in *Tellabs III*, stating that "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *Tellabs III*, 513 F.3d 702, 710 (7th Cir. 2008) (citing *First Commodity Corp. of Boston v. CFTC,* 676 F.2d 1, 7–9 (1st Cir. 1982)). Further, Spectrum's share repurchases could have been done for any number of reasons—to increase shareholder value by reducing the number of shares on the market, to improve its financial ratios, or to mitigate the release of bad financial information. Indeed, while Defendants tout the April 26, 2018 announcement of a "$1 billion" repurchase plan (Dkt. 21, at 23), Spectrum specifically announced that plan in conjunction with the news that it had terrible financial results from GAC and HHI, that it had fired Rouvé, and that it had replaced him with Maura. This stock-repurchase program enabled Maura in his first official act as CEO to announce that "[t]he Board's approval of a new $1 billion share repurchase program underscores our confidence in the business and long-term outlook." Dkt. 22, Ex. 16. Spectrum's public-relations strategy should not be allowed to defeat an inference of scienter here.

Moreover, repurchase programs are only potentially relevant to an analysis of scienter where Plaintiffs are relying on a "motive" argument to allege scienter, but Plaintiffs are not required to allege a motive in order to allege scienter. *See Tellabs II*, 551 U.S. at 325; *Tellabs III*,

49

513 F.3d at 710 (rejecting motion to dismiss even where "there is no indication that [the defendant CEO] or anyone else who may have been in on the fraud profited from it financially"). Plaintiffs here allege Defendants' scienter based on their knowledge of adverse information contradicting their public statements or recklessness in making public statements without checking the facts. In a "knowledge or recklessness" case like this, stock purchases by a defendant (including the corporate defendant) do not defeat scienter. *See In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 306, 320 (S.D.N.Y. 2013) (finding scienter adequately alleged where defendants bought stock during class period); *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *12–13 (N.D. Ga. Jan. 29, 2009) (same). The cases cited by Defendants, Dkt. 21, at 22 & n.5, are inapplicable, because the courts there addressed repurchases in the context of the motive-and-opportunity theory or found scienter inadequately pleaded not only because the companies repurchased stock but also because there was a dearth or absolute lack of other facts supporting scienter.[19] In all but two of these cases, the courts also found that plaintiffs did not adequately

---

[19] *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 218–25 (S.D.N.Y. 2018) (plaintiff alleged only "admissions" that were not really admissions and internal reports that did not contradict defendants' public statements); *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 492, 514–18 (S.D. Tex. 2017) (plaintiff alleged only defendants' corporate positions, internal reports not received by defendants, and small sales by two defendants while two others bought larger amounts); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 932 (N.D. Cal. 2017) (plaintiffs alleged only "generalities about management's access to data"); *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1200–04 (S.D. Fla. 2015) (confidential sources and internal reports did not demonstrate that defendants had contradictory information); *In re Cisco Sys. Inc. Sec Litig.*, 2013 WL 1402788, at *11–12 (N.D. Cal. Mar. 29, 2013) (same); *In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at *11 (N.D. Cal. May 11, 2006) (analyzing repurchases in context of motive-and-opportunity theory); *In re Tibco Software, Inc.*, 2006 WL 1469654, at *18–30 (N.D. Cal. May 25, 2006) (confidential sources did not demonstrate that defendants had contradictory information). The decision in *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734 (N.D. Cal. June 8, 1994), was on summary judgment and provides no support for Defendants' Rule 12(b)(6) motion here. In *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323 (S.D.N.Y. 2011), the court rejected an argument that an absence of repurchases supports scienter; its statement that repurchases support scienter is dicta. *See id.* at 337–38.

allege false statements, making the absence of scienter a foregone conclusion.[20]

### C.   Lead Plaintiffs Have Standing to Assert Claims On Behalf of Purchasers of HRG Stock Against Spectrum Legacy.

From before the Class Period until July 13, 2018, Defendant Spectrum Brands Holdings was a publicly traded corporation known as HRG Group, Inc. ("HRG"), whose stock was traded on the NYSE under the ticker symbol "HRG." ¶ 25. From before the Class Period until July 13, 2018, Defendant Spectrum Brands Legacy, Inc. ("Spectrum Legacy") was a publicly traded corporation known as Spectrum Brands Holdings, Inc., whose stock was traded on the NYSE under the ticker symbol "SPB." ¶ 24. HRG was a holding company; its principal asset was stock of Spectrum Legacy, and Spectrum Legacy accounted for over 99% of its total revenue. *Id.* In numerous SEC-required disclosures during the Class Period, HRG explicitly directed its stockholders to review Spectrum Legacy disclosures for a more informed understanding of HRG's financial position, and HRG and Spectrum Legacy's stock prices were highly correlated. ¶ 26. Moreover, Defendant Maura is a former HRG officer and remained on HRG's board until December 2017, and at least three Spectrum Legacy board members were also HRG officers or directors throughout the Class Period. ¶ 25.

In a merger announced on February 26, 2018 and completed on July 13, 2018 (the "Merger"), Spectrum Legacy became a wholly owned subsidiary of HRG, and HRG stock was converted into Spectrum stock. In the Merger, (1) Spectrum Brands Legacy became a wholly owned subsidiary of HRG and ceased to be publicly traded, and (2) HRG was renamed Spectrum

---

[20] The exceptions are *Plumbers & Pipefitters Local Union v. Zimmer* and *Biogen*, which are distinguishable. *See Plumbers & Pipefitters Local Union v. Zimmer*, 673 F. Supp. 2d at 749 (finding scienter inadequately pled based on "the relative economic insignificance of [the products at issue] to Zimmer's overall business" and "the lack of an allegation . . . showing Defendants' access to, or actual knowledge of, material information"); *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016) (addressing repurchases in motive-and-opportunity analysis).

Brands Holdings and continued to be publicly traded under the ticker symbol of "SPB"—the same ticker symbol as pre-Merger Spectrum Legacy. Compl. 1 n.1, ¶23. Thus, pre-Merger HRG and post-Merger Spectrum Brands Holdings are the identical corporation except for the change of name. *Id.* While the price of HRG and Spectrum Legacy stock was always highly correlated, once the Merger was announced and until it was completed, HRG's stock traded virtually identically in tandem with Spectrum Legacy stock. ¶ 26.

Plaintiffs have asserted claims against Defendants on behalf of shareholders in pre-Merger Spectrum Brands Legacy, pre-Merger HRG, and post-Merger Spectrum Brands Holdings. ¶¶ 23-25. Defendants argue that Plaintiffs cannot maintain claims on behalf of pre-Merger purchasers of HRG stock because (1) purchasers of stock in HRG purportedly cannot bring claims against Spectrum Brands Legacy, which made materially false statements in connection with purchases of stock of HRG, and (2) they claim that pre-Merger HRG shareholders did not receive notice of this action under the PSLRA. Both arguments fail.

### 1.    Purchasers of HRG Stock May Bring Claims Against Spectrum and the Executive Defendants.

The Supreme Court has repeatedly held that claims for securities fraud may be brought against any person who makes false statements in connection with a purchase or sale of securities, not only against the issuer and the issuer's officers. Here, Plaintiffs properly bring securities-fraud claims against Spectrum Legacy and the Executive Defendants (secondary actors as against HRG shareholders) on behalf of pre-Merger purchasers of HRG stock, based on pre-Merger Spectrum Legacy's false and misleading statements in connection with those purchases.

As an initial matter, Defendants do not challenge Plaintiffs' standing to bring claims against the Executive Defendants on behalf of pre-Merger HRG investors. Dkt. 21, at 4, 43–52 (challenging only claims against Spectrum). Thus, Defendants have waived any challenge to Plaintiffs' claims

against the Executive Defendants on behalf of HRG purchasers. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("the district court is entitled to find that an argument raised for the first time in a reply brief is forfeited"); *Worrell v. Wells Fargo Bank, N.A.*, 2014 WL 12726562, at *1 (W.D. Wis. Jan. 27, 2014) (denying motion to dismiss claims first challenged on reply).

Plaintiffs also have standing to bring claims against Spectrum Legacy based on pre-Merger Spectrum's false statements in connection with investors' purchases of HRG stock. In *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), the Supreme Court established a bright-line test allowing claims against non-issuers as long as every element of a Rule 10b–5 claim is met. Indeed, for well over twenty years, the Supreme Court has conferred standing on plaintiffs bringing §10(b) claims against parties other than an issuer that make false statements concerning the issuer (as Spectrum here). *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). *In Central Bank*, the Supreme Court recognized liability for "secondary actors" <u>without qualification</u>:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. <u>Any person or entity,</u> including [but not limited to] a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies <u>may be liable as a primary violator under 10b–5</u>, assuming *all* of the requirements for primary liability under Rule 10b–5 are met.

*Id*.

In *Stoneridge*, the Supreme Court again made clear that corporations whose stock was not purchased or sold by plaintiffs can be primarily liable under §10(b) for their public deceptive conduct. There, the Supreme Court held—<u>again without limitation due to the nature of the secondary actor's business or relationship to the issuer</u>—that there is a private right of action under

§10(b) against entities other than issuers, provided that their conduct "satisf[ies] each of the elements or preconditions for liability. . . ." 552 U.S. at 158.[21]

Following *Stoneridge*, courts nationwide have sustained primary claims against non-issuers. In *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp.3d 1145, 1184 1191 (D. Or. 2015), the court sustained §10(b) misrepresentation and scheme claims against a non-issuer investor-relations firm (DreamTeam), which had agreed to tout Galena's stock by disseminating misleading positive articles on the company. The court sustained misrepresentation claims against non-issuer DreamTeam based on its materially misleading articles that were made "in connection with" investors' purchase of Galena stock. *Id.* at 1184. Here, the business relationship between Spectrum and HRG is much stronger, deeper, and more longstanding than that between Galena and its unrelated investor-relations firm.

Similarly, in *In re HealthSouth Corp. Securities Litigation*, the court sustained §10(b) claims against UBS—an unrelated public company that issued analyst reports on, underwrote offerings for, and extended lines of credit to HealthSouth—for UBS's statements and deceptive acts that furthered a fraud on HealthSouth investors. Relying on *Stoneridge*, the court held that the complaint "adequately plead[ed] that UBS committed a primary violation/deceptive act that was communicated to the public, influenced the stock price, and caused Plaintiffs' losses." *In re HealthSouth Corp. Sec. Litig.*, CV-03-BE-1500-S (N.D. Ala. Feb. 4, 2009) (Dkt. 27); *see also In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 277 (N.D. Ala. 2009) (reiterating that "under *Stoneridge* the Supreme Court made clear that a defendant who participates in a fraudulent scheme

---

[21] In *Stoneridge*, investors could not bring §10(b) claims against customers of the issuer only because (unlike here) those defendants' "deceptive acts were not communicated to the public" and "[n]o member of the investing public had knowledge, either actual or presumed, of [defendants'] deceptive acts during the relevant times." *Stoneridge,* 552 U.S. at 159.

faces liability for its deceptive public acts or statements"); *Salomon Analyst Metromedia Litigation*, 544 F.3d 474, 481–82 (2d Cir. 2008) (holding that "there is no reason in law or logic to apply a bright-line rule prohibiting the application of the *Basic* presumption in suits against secondary actors," because *Stoneridge* "held that there is a private right of action under Section 10(b) against entities other than issuers"); *Ziemba v. Cascade Int'l Inc.*, 256 F.3d 1194, 1205 (11th Cir. 2001) ("in light of *Central Bank*," a "secondary actor" can be primarily liable under §10(b) if the reliance element is satisfied, as it is here under the fraud-on-the-market presumption afforded by *Basic Inc. v. Levinson*, 485 U.S. 224, 250 (1988)).

Lead Plaintiffs have satisfied §10(b)'s "in connection with" requirement by linking Spectrum's misrepresentations to Plaintiffs' purchases of HRG common stock. ¶¶ 25-26.[22] *See In re Valujet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1478 (N.D. Ga. 1997) ("A misrepresentation is 'in connection' with a securities transaction if the misrepresentation 'touches' the purchase or sale of the security."). Here, Spectrum's statements about its own operations and the value of its stock (which necessarily drove HRG's stock price) "concerned" HRG, which was simply a holding company for Spectrum. At minimum, Lead Plaintiffs have satisfied the "in connection with requirement" for HRG trades from at least February 26, 2018 when HRG and Spectrum Legacy announced the Merger and their stock prices were locked into tandem trading, since the price of Spectrum stock necessarily dictated the value HRG shareholders would receive in the Merger. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 177 (3d Cir. 2000) (in considering secondary actor liability, "[i]t is well established that information concerning a tender offer or a proposed merger

---

[22] As alleged in the Complaint, Spectrum's statements and conduct satisfy each contested element of §10(b) with respect to HRG investors: materially false representations, scienter, loss causation, and reliance.

may be material to persons who trade in the securities of the target company, despite the highly contingent nature of both types of transactions.").

The principal case cited by Defendants for their manufactured bar against claims by investors in one company against another company that makes misrepresentations concerning the first company—*Ontario Public Services Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004)—was later expressly retracted in relevant part by the Second Circuit in *In re NYSE Specialists Securities Litigation*, 503 F.3d 89, 102 (2d Cir. 2007). Faced with a "flawed" misreading of *Nortel* similar to that presented by Defendants here, the Second Circuit in *NYSE Specialists* held that "the district court incorrectly read *Nortel Networks* to mean that an action under Rule 10b–5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security. . . . That is not what <u>*Nortel Networks*</u> held." *Id.*

Defendants' other cited cases simply do not address the question presented here. *In Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), the Court held only that persons who never bought the subject securities could not bring securities-fraud claims on the speculative theory that they would have bought if defendants had not made false statements. *See id.* at 747, 749. In *Roots Partnership v. Land's End, Inc.*, 965 F.2d 1411 (7th Cir. 1992), the court held that an investor could not bring 10b–5 claims based on false statements made after its last purchase, because those statements could not have affected its earlier purchases. *See id.* at 1420. Here, certain alleged false statements preceded Class members' purchases of HRG stock. In *APA Excelsior III, L.P. v. Windley*, 329 F. Supp. 2d 1328 (N.D. Ga. 2004), plaintiffs brought claims based on a foreclosure sale of stock of a company called HFI, but plaintiffs neither owned any HFI stock at the time of the foreclosure nor sold any HFI stock in the foreclosure. *See id.* at 1346–47. Here, there is no dispute that some Class members purchased HRG stock. In *Duane & Virginia Lanier*

56

*Trust v. SandRidge Mississippian Trust I*, 361 F. Supp. 3d 1162 (W.D. Okla. 2019), the court held that purchasers of one oil-and-gas trust could not bring securities-fraud claims against a different trust that had some overlapping management but was legally distinct and received royalties from different wells. *See id.* at 1170–71. None of these cases involved the situation here—false statements by a publicly traded company's principal subsidiary that accounted for 99% of the publicly traded parent's revenue.

Thus, Plaintiffs have standing under *Stoneridge* and *Central Bank* to bring claims against Spectrum on behalf of pre-Merger purchasers of HRG stock (and Defendants have waived any challenge to claims against the Executive Defendants on behalf of these purchasers).

### 2. Plaintiffs Complied with the PSLRA in Bringing Claims on Behalf of Purchasers of HRG Stock.

In accordance with the PSLRA, when this Action was initiated, notice was issued "advising members of the purported plaintiff class" of the pendency of the Action. 15 U.S.C. § 78u–4(a)(3)(A). Defendants now claim that the notice as issued did not include HRG shareholders, and thus, the claim on behalf of HRG shareholders should be dismissed. Dkt. 21, at 48-52. They are wrong.

First, the notices that were issued did encompass HRG shareholders. The first notice was issued on behalf of "All persons or entities who purchased or otherwise acquired securities of Spectrum Brands Legacy, Inc. (f/k/a Spectrum Brands Holdings, Inc.) (NYSE: SPB) between June 14, 2016 and April 25, 2018, inclusive." Dkt. 22-2. Thus, this notice covered investors who purchased the publicly traded securities of Spectrum both before and after the merger. A second notice expanding the Class Period was issued on behalf of "investors who purchased Spectrum's publicly traded securities from June 14, 2016 to November 16, 2018, inclusive" (emphasis added); this notice defined "Spectrum" as "Spectrum Brands Holdings, Inc. ('Spectrum' or the

'Company') (NYSE: SPB)." Dkt. 22-4. "Spectrum Brands Holdings, Inc." was called HRG before the Merger—as discussed above, it is the identical corporation and has only changed its name— so this notice covers HRG investors during the pre-Merger part of the Class Period.

Second, even if the initial notices did not encompass pre-Merger HRG shareholders, no new PSLRA notice is necessary. Courts routinely permit amendment to expand class periods, which brings additional members into the class, without requiring new notice. *See Rauch v. Vale, S.A.*, 378 F. Supp. 3d 198, 207 (E.D.N.Y. 2019). That is exactly what adding pre-Merger purchasers of HRG stock to the Class here does, because the parties agree that post-Merger purchasers of stock of HRG (now called Spectrum Brands Holdings, Inc.) have been in the case from the beginning. Courts also routinely permit amendment to add claims under the Securities Act of 1933, which invariably include additional defendants, such as outside directors and underwriters, to cases that originally alleged only claims under the Exchange Act, without requiring new notice. *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 364–65 (E.D.N.Y. 2013).[23]

Defendants do not cite a single case in which any court has dismissed any claims in an amended complaint based on defendants' challenge to the sufficiency of the original PSLRA notice. Dkt. 21, at 49–52. At most, a few of Defendants' cases required issuance of a PSLRA notice for new claims that greatly expanded the originally filed case. *See, e.g.*, *Kipling v. Flex, Ltd.*, 2019 WL 1472358, at \*2 (N.D. Cal. Apr. 3, 2019) (requiring issuance of new notice where amended

---

[23] The fact that the original complaint did not expressly name pre-Merger HRG as a Defendant is immaterial, because it is the same Spectrum Brand Holdings that was identified as a Defendant in one of the PSLRA notices, and "neither case law nor the provisions of the PSLRA require a second notice to be published when the complaint was amended to add [an] additional defendant." *Greenberg v. Bear Stearns & Co.*, 80 F. Supp. 2d 65, 69 (E.D.N.Y. 2000); *see also Hill v. Tribune Co.*, 2006 WL 2861016, at \*1 (N.D. Ill. Sept. 29, 2006) (allowing amendment adding defendants without requiring new PSLRA notice).

complaint "focuses on an entirely different factual scenario and set of misrepresentations" than original complaint, and the "new facts and alleged misrepresentations . . . arose in the months after [the] original complaint and PSLRA notice"). No such circumstances are present here: The Complaint concerns the same misrepresentations about the Consolidations that were at issue in the original complaint and PSLRA notices, and purchasers of HRG stock were on notice of the action from the PSLRA notices concerning the Spectrum stock into which their HRG stock was converted in the Merger. Moreover, Defendants have not requested issuance of a new notice, which is the only conceivable remedy that the non-controlling district court decisions on which they rely could support. Their motion to dismiss based on the PSLRA is supported by no authority at all.

### D.    The Complaint Alleges Section 20(a) Claims.

The Complaint adequately pleads Plaintiffs' Section 20(a) claim against the Executive Defendants as controlling persons under the 1934 Act. *See* 15 U.S.C. § 78t. To establish a 20(a) claim, a plaintiff must allege (1) a primary violation; (2) that the defendant exercised control over the operations of the primary violator; and (3) that the defendant possessed the power, whether or not exercised, to control the fraudulent activity. *In re Westell Techs., Inc.*, 2001 WL 1313785, at *12 (N.D. Ill. Oct. 26, 2001). Defendants' sole argument against 20(a) liability is that there was no primary violation, as Defendants do not contest "control." As discussed above, *see supra* § 3, the Complaint adequately pleads a primary violation under Section 10(b). Thus, the Complaint also adequately alleges a Section 20(a) claim against the Executive Defendants.

## IV.    CONCLUSION

Defendants' motion to dismiss the Complaint should be denied. Should the Court determine to dismiss any part of the Complaint, Plaintiffs respectfully request leave to amend.

Dated: October 10, 2019                              Respectfully submitted,

                                                    */s/ Katherine M. Sinderson*
                                                    **BERNSTEIN LITOWITZ BERGER
                                                      & GROSSMANN LLP**
                                                    Avi Josefson
                                                    875 North Michigan Avenue, Suite 3100
                                                    Chicago, Illinois 60611
                                                    Telephone: (312) 373-3880
                                                    Facsimile: (312) 794-7801
                                                    avi@blbglaw.com

                                                    -and-

                                                    Katherine M. Sinderson
                                                    Jai Chandrasekhar
                                                    Matthew Traylor
                                                    1251 Avenue of the Americas, Fl. 44
                                                    New York, NY 10020
                                                    Telephone: (212) 554-1400
                                                    Facsimile: (212) 554-1444
                                                    Email: KatieM@blbglaw.com
                                                    Email: Jai@blbglaw.com
                                                    Email: Matthew.Traylor@blbglaw.com

                                                    *Lead Counsel for Lead Plaintiffs the Public School
                                                    Teachers' Pension & Retirement Fund of Chicago
                                                    and the Cambridge Retirement System and the
                                                    Class*

                                                    **RATHJE WOODWARD LLC**

                                                    Douglas M. Poland
                                                    State Bar No. 1055189
                                                    10 E. Doty Street, Suite 507
                                                    Madison, WI 53703
                                                    Telephone: (608) 960-7430
                                                    Facsimile: (608) 960-7460
                                                    dpoland@rathjewoodward.com

                                                    *Liaison Counsel for Lead Plaintiffs the Public
                                                    School Teachers' Pension & Retirement Fund of
                                                    Chicago and the Cambridge Retirement System
                                                    and the Class*