**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

|  |  |  |
|---|---|---|
| IN RE SPECTRUM BRANDS SECURITIES LITIGATION | ) ) ) ) ) | No. 19-cv-347-jdp |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Richard A. Rosen, admitted *pro hac vice*
Andrew J. Ehrlich, admitted *pro hac vice*
Adam J. Bernstein, admitted *pro hac vice*
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: 212-373-3000
Fax: 212-757-3990
rrosen@paulweiss.com
aehrlich@paulweiss.com
abernstein@paulweiss.com

Matthew D. Lee, WI Bar No. 1061375
FOLEY & LARDNER LLP
150 East Gilman Street, Suite 5000
Madison, WI 53703-1482
Tel.: 608-257-5035
Fax: 608-258-4258
mdlee@foley.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................ 3

I.      The Amended Complaint Fails to Allege Facts Giving Rise to a Strong Inference
        that the Defendants Acted with Scienter .................................................................... 3

        A.      Spectrum's Stock Repurchase Programs During the Class Period Negate
                Any Inference of Scienter. ................................................................................ 3

        B.      The Anonymous "Confidential Witness" Allegations Do Not Give Rise
                to a Strong Inference of Scienter. .................................................................... 5

        C.      The Other Allegations in the Amended Complaint Fail to Give Rise to a
                Strong Inference of Scienter, and Spectrum's Conduct Refutes Such an
                Inference. ......................................................................................................... 14

        D.      Defendants Have Offered a Compelling Competing Inference that
                Refutes a Finding of Scienter. ......................................................................... 15

II.     The Amended Complaint Fails to Allege that Certain of Spectrum's Statements
        About Its Consolidation Projects Were False. ............................................................ 16

III.    Certain Statements Regarding the Consolidation Projects are Forward-Looking
        Statements Protected by the PSLRA's Safe Harbor. .................................................. 18

        A.      The Challenged Statements Are Forward-Looking. ......................................... 19

        B.      Defendants' Forward-Looking Statements Were Accompanied by
                Detailed Risk Disclosures Addressing the Specific Risks that Came to
                Pass. ................................................................................................................ 21

IV.     Defendants' Statements About the Consolidations Are Non-Actionable
        Opinions. .................................................................................................................... 22

V.      Several of Defendants' Statements About the GAC and HHI Consolidations
        Were Vague and Optimistic Puffery, Not Actionable Under the Securities Laws. ...... 25

VI.     Lead Plaintiffs Cannot Bring Claims on Behalf of Pre-Merger HRG
        Shareholders Against Spectrum Brands Holdings. ..................................................... 29

        A.      Pre-Merger HRG Shareholders Have No Standing to Sue Spectrum
                Brands Holdings, Inc. for Damage to Their Pre-Merger HRG Shares. ............. 29

        B.      Claims by Pre-Merger HRG Shareholders Against Spectrum Should Be
                Dismissed Because the Statutorily Required PSLRA Process Was Not
                Followed for a Putative Class of HRG Shareholders. ...................................... 32

VII.    The Section 20(a) Claims Must Be Dismissed for Failure to Plead a Primary
        Violation. .................................................................................................................... 34

CONCLUSION ....................................................................................................................... 34

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Akorn, Inc. Sec. Litig.*,
   240 F. Supp. 3d 802 (N.D. Ill. 2017) ...................................................................27

*In re Altisource Portfolio Solutions, S.A. Sec. Litig.*,
   No. 14-81156-CIV-WPD, 2015 WL 12001262 (Sept. 4, 2015) ............................31

*In re Arantana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018)...................................................................26

*Asher* v. *Baxter Int'l*,
   377 F.3d 727 (7th Cir. 2004) ................................................................................22

*Bodri* v. *GoPro, Inc.*,
   252 F. Supp. 3d 912 (N.D. Cal. 2017) ...................................................................4

*Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994)...............................................................................................30

*In re Cisco Sys. Inc. Sec Litig.*, No. C 11–1568 SBA,
   2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013)...............................................4

*City of Austin Police Ret. Sys.* v. *ITT Educ. Servs., Inc.*,
   388 F. Supp. 2d 932 (S.D. Ind. 2005) .....................................................................8

*City of Warwick Mun. Emps. Pension Fund* v. *Rackspace Hosting, Inc.*,
   No. 17 CIV. 501 (JFK), 2019 WL 452051 (S.D.N.Y. Feb. 5, 2019).....................27

*CMFG Life Ins. Co.* v. *UBS Sec.*,
   30 F. Supp. 3d 822 (W.D. Wis. 2014) ...................................................................18

*Comms. Workers of Am.* v. *CSK Auto Corp.*,
   2007 WL 951968 (D. Ariz. 2007)..........................................................................14

*Constr. Workers Pension Fund-Lake County & Vicinity* v. *Navistar Int'l Corp.*,
   114 F. Supp. 3d 633 (N.D. Ill. 2015) ...............................................................14, 21

*Desai* v. *Gen. Growth Props.*,
   654 F. Supp. 2d 836 (N.D. Ill. 2009) .......................................................19, 21, 28

*Duane & Virginia Lanier Trust* v. *SandRidge Mississippian Trust I*,
   361 F. Supp. 3d 1162 (W.D. Okla. 2019) ..............................................................31

ii

*SEC* v. *First Am. Bank & Trust Co.*,
  481 F.2d 673 (8th Cir. 1973) .......................................................................16

*Frankfurt-Trust Inv. Luxemburg AG* v. *United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018).............................................................4

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................30

*Hachem* v. *Gen. Elec., Inc.*,
  No. 17-CV-8457 (JMF), 2018 WL 1779345 (S.D.N.Y. Apr. 12, 2018) ...............33

*In re Harley-Davidson, Inc. Sec. Litig.*,
  660 F. Supp. 2d 969 (E.D. Wis. 2009).........................................................19

*Harris* v. *Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ....................................................................19

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018) ........................................................27

*In re HealthSouth Corp. Sec. Litig.*,
  257 F.R.D. 260 (N.D. Ala. 2009)..................................................................30

*Henningsen* v. *ADT Corp.*,
  161 F. Supp. 3d 1161 (S.D. Fla. 2015) ..........................................................4

*Izadjoo* v. *Helix Energy Sols. Grp., Inc.*,
  237 F. Supp. 3d 492 (S.D. Tex. 2017) ...........................................................4

*Julianello* v. *K-V Pharm. Co.*,
  791 F.3d 915 (8th Cir. 2015) .....................................................................19

*Kipling* v. *Flex, Ltd.*,
  No. 18-CV-02706-LHK, 2019 WL 1472358 (N.D. Cal. Apr. 3, 2019) ................33

*Lloyd* v. *CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ....................................................................26

*Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ................................................................ passim

*Marks* v. *CDW Computer Ctrs., Inc.*,
  122 F.3d 363 (7th Cir. 1997) .....................................................................26

*Mart* v. *Forest River, Inc.*,
  854 F. Supp. 2d 577 (N.D. Ind. 2012) .........................................................18

iii

*Mathews* v. *Centex Telemgm't, Inc.*,
No. C–92–1837–CAL, 1994 WL 269734 (N.D. Cal. June 8, 1994) ..........................................5

*McMahan & Co.* v. *Wherehouse Entertainment, Inc.*,
900 F.2d 576 (2d Cir. 1990)...................................................................................16

*In re Midway Games, Inc. Sec. Litig.*,
332 F. Supp. 2d 1152 (N.D. Ill. 2004) ...........................................................19, 26

*In re NVE Corp. Sec. Litig.*,
551 F. Supp. 2d 871 (D. Minn. 2007) .......................................................................27

*In re NYSE Specialists Sec. Litig.*,
503 F.3d 89 (2d Cir. 2007)...................................................................................31

*Okla. Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018).......................................................................25

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indust. Pension Fund*,
135 S. Ct. 1318 (2015).................................................................................24, 25

*Ontario Pub. Serv. Emps. Union Pension Tr. Fund* v. *Nortel Networks Corp.*,
369 F.3d 27 (2d Cir. 2004)...................................................................................31

*Perez* v. *Higher One Holdings, Inc.*,
No. 14-cv-755 (AWT), 2016 WL 6997160 (D. Conn. Sept. 13, 2016)...................................23

*Plumbers & Pipefitters Local Union* v. *Zimmer*,
673 F. Supp. 2d 718 (S.D. Ind. 2009) ...............................................................4, 8

*Public. Employees' Retirement Sys. of Mississippi* v. *TreeHouse Foods, Inc.*,
No. 16 C 10632, 2018 WL 844420 (N.D. Ill. Feb. 12, 2018).........................................23, 28

*Pugh* v. *Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ...............................................................................18

*Rauch* v. *Vale, S.A.*,
378 F. Supp. 3d 198 (E.D.N.Y 2019) .......................................................................33

*Rochester Laborers Pension Fund* v. *Monsanto Co.*,
883 F. Supp. 2d 835 (E.D. Mo. 2012).......................................................................27

*Roth* v. *OfficeMax, Inc.*,
No. 05 C 236, 2006 WL 2661009 (N.D. Ill. Sept. 13, 2006).............................................14

*Salomon Analyst Metromedia Litig.*,
544 F.3d 474, 481-82 (2d Cir. 2008) .......................................................................30

iv

*Schleicher* v. *Wendt*,
   529 F. Supp. 2d 959 (S.D. Ind. 2007) ...............................................................14, 15

*In re Select Comfort Corp. Sec. Litig.*,
   No. 99 Civ. 884, 2000 WL 35529101 (D. Minn. Jan. 27, 2000) ...........................33

*Semerenko* v. *Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000)....................................................................................30

*Shenk* v. *Karmazin*,
   867 F. Supp. 2d 379 (S.D.N.Y. 2011)....................................................................14

*Silverman* v. *Motorola*,
   No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008).................................27

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019).....................................................................................26

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008)................................................................................................30

*Stransky* v. *Cummins Engine Co., Inc.*,
   51 F.3d 1329 (7th Cir. 1995) ...........................................................................16, 17

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
   2005 WL 1322721 (S.D.N.Y. Jun. 1, 2005) ..........................................................33

*In re Tibco Software, Inc.*,
   No. C 05-2146, 2006 WL 1469654 (N.D. Cal. May 25, 2006) .................................5

*Tongue* v. *Sanofi*,
   816 F.3d 199 (2d. Cir. 2016)..................................................................................24

*Vallabhaneni* v. *Endocyte, Inc.*,
   14-cv-01048, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016) ...........................................8

*Van Noppen* v. *InnerWorkings, Inc.*,
   136 F. Supp. 3d 922 (N.D. Ill. 2015) .....................................................................26

*W. Pa. Elec. Emps. Pension Trust* v. *Plexus Corp.*,
   No. 07C0582, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009).....................................19

*Waldman* v. *Wachovia Corp.*,
   No. 08 Civ. 2913 (SAS), 2009 WL 2950362 (S.D.N.Y. Sept. 14, 2009) ...............33

*Wozniak* v. *Align Tech., Inc.*,
   850 F. Supp. 2d 1029 (N.D. Cal. 2012) .................................................................26

*Ziemba* v. *Cascade Int'l Inc.*,
    256 F.3d 1194 (11th Cir. 2001) ........................................................................................30

**STATUTES**

15 U.S.C. § 78u-5(i)(1)(A)-(D)........................................................................................19

15 U.S.C. § 78u-5(c)(1) ....................................................................................................19

**OTHER AUTHORITIES**

Rule 9(b) ...........................................................................................................................13

Rule 10b-5....................................................................................................................16, 31

Defendants Spectrum Brands Holdings, Inc., Spectrum Brands Legacy, Inc. ("Spectrum" or the "Company"), HRG Group, Inc. ("HRG"), Andreas R. Rouvé, David M. Maura, and Douglas L. Martin (collectively, "Defendants," and Rouvé, Maura and Martin, the "Individual Defendants") respectfully submit this Reply Memorandum of Law in support of their motion to dismiss Lead Plaintiffs' Amended Complaint for Violations of the Federal Securities Laws (the "Amended Complaint").

## PRELIMINARY STATEMENT

Over a nearly two-year period, Spectrum undertook to consolidate complex distribution functions for two business segments and hundreds of consumer products into two centralized locations. Whatever the challenges those projects faced, Defendants' statements about them do not give rise to a claim for securities fraud:

- *First*, Lead Plaintiffs' principal strategy of relying on "Confidential Witnesses" does not survive scrutiny. As set forth below and in our opening brief, the Confidential Witness allegations suffer from numerous infirmities, and fail to raise a strong inference of scienter. Even if these allegations are all true, and even if the information underlying these allegations was communicated to the Defendants (which the Amended Complaint fails to allege), it does not mean Defendants spoke falsely when they stated the projects overall were making "good progress," or predicted that difficulties were "temporary" or "transitional."

- *Second*, the other arguments that Lead Plaintiffs claim support an inference of scienter likewise fail. For instance, neither speaking frequently to the market about the projects, nor changing leadership during the Class Period,

suggests that a party is seeking to deceive—to the contrary, such activity demonstrates a commitment to keeping the market informed and creating shareholder value. In addition, Lead Plaintiffs totally discount the fact that Spectrum, over the course of the proposed Class Period, re-purchased more than $250 million in its own stock, a fact that strongly negates any inference of scienter.

- *Third*, Lead Plaintiffs have failed to adequately allege that the challenged statements are false; to the contrary, Lead Plaintiffs appear to concede that many of the challenged statements are "technically"—i.e., actually—true. Moreover, Lead Plaintiffs cannot overcome the fact that certain of the challenged statements are forward-looking; certain are opinions; and certain are puffery. Each conclusion alone precludes Lead Plaintiffs' claims.

- *Finally*, the proposed class of shareholders of another issuer, HRG, lacks standing to pursue securities fraud claims against the Spectrum Defendants for statements they made about Spectrum's business. In any event, even if they had standing—which they do not—Lead Plaintiffs failed entirely to follow the statutorily required lead plaintiff selection process, so that the putative class could be put on notice of the opportunity to apply to be lead plaintiff.

For these reasons, those set forth below, and those in Defendants' moving brief, the Amended Complaint should be dismissed with prejudice.

2

## ARGUMENT

**I.     The Amended Complaint Fails to Allege Facts Giving Rise to a Strong Inference that the Defendants Acted with Scienter.**

Lead Plaintiffs do not raise a strong inference of scienter.  Most fundamentally, even if the information alleged by the cited Confidential Witnesses were true, and even if that information was known by the Defendants, Defendants still could have made honestly held, good-faith statements and predications that the problems encountered at the Dayton, Ohio, and Edgerton, Kansas facilities were "transitory" or that "good progress" in solving those problems was being made.  In other words, simply because certain anonymous low-level employees identified challenges and setbacks in the massive logistical effort to consolidate distribution centers for hundreds of consumer products, those challenges and setbacks do not establish that the Defendants intended to deceive the market when they said that these projects were progressing, or that the problems were temporary.  At most, the Lead Plaintiffs plead merely that the Defendants' statements of optimism were not all borne out by events that followed—the classic pleading of fraud-by-hindsight.

**A.     Spectrum's Stock Repurchase Programs During the Class Period Negate Any Inference of Scienter.**

As an initial matter, any possible inference of scienter is undercut by the fact that Spectrum repurchased more than *$250 million* of its own shares during the Class Period.  As courts around the country have held, it would make no sense at all for a company that was artificially inflating its stock price to expend significant resources to acquire that stock at prices it knew were artificially inflated.

The undisputed facts bear repeating:  On January 24, 2017—just two days prior to the commencement of the Class Period—Spectrum authorized a $500 million common stock repurchase program, which was effective for 36 months.  (Br. at 22-23.)  From November 2017 to

December 2017, Spectrum repurchased almost 70,000 shares, at an average price per share of $114.88.  (*Id.*)  From February 2018 to April 2018, Spectrum repurchased more than 2.5 million shares at an average price per share of $98.71 (for a total of approximately $250 million), at the very time Lead Plaintiffs assert Defendants were lying to the market to artificially inflate Spectrum's share price.  (*Id.*)  Thereafter, on April 26, 2018—still more than six months before the end of the proposed Class Period—Spectrum reauthorized and expanded its stock repurchase program, announcing a $1 billion common stock repurchase program effective immediately.  (*Id.*)

Lead Plaintiffs criticize the timing of the April 2018 stock repurchase authorization as undertaken to mitigate bad financial news, but completely ignore the fact that there was a prior stock purchase authorization, approved two days *before* the Class Period began, and that the Class Period continues for many months after it.  Thus, Spectrum was standing squarely behind the stated rationale for its buyback program—the Company's strong performance—by buying shares throughout almost all of the Class Period.

This massive stock buyback program negates any inference that the Defendants knowingly inflated the Company's stock price, and the case law cited in our moving brief makes that clear.  (*See* Br. at 22 n.5.)  Lead Plaintiffs argue that stock buyback programs are only relevant to scienter for cases in which the plaintiff relies upon "motive and opportunity" allegations.  This contention is plainly incorrect.  Eight of the eleven cases that Defendants cited in their moving brief are completely unrelated to the "motive and opportunity context," and Lead Plaintiffs make virtually no effort to distinguish them.[1]  In addition, the few cases Lead Plaintiffs cite in support

---

[1]  *See, e.g.*, *Frankfurt-Trust Inv. Luxemburg AG* v. *United Techs. Corp.*, 336 F. Supp. 3d 196, 218 (S.D.N.Y. 2018); *Zimmer*, 673 F. Supp. 2d at 749 ("[S]tock repurchase programs actually *negate* a finding of scienter.") (emphasis in original); *Izadjoo* v. *Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) (noting "stock repurchase program rebuts a finding of scienter") (citation omitted); *Bodri* v. *GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017) (stating stock repurchases "undercut[] a finding of intent"); *Henningsen* v. *ADT Corp.*, 161 F. Supp. 3d 1161, 1204 (S.D. Fla. 2015) ("[S]tock repurchase programs actually *negate* a finding of scienter.") (citation omitted); *In re Cisco Sys. Inc. Sec Litig.*, No. C 11–1568 SBA, 2013 WL 1402788, at *8

4

of their theory are in the context of *individual defendants* purchasing stock in the company, not a company-authorized stock repurchase program.  Lead Plaintiffs citation to *Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008) ("*Tellabs III*") fares no better:  *Tellabs III* did not evaluate the relevance of a stock buyback program or such a program's relevance to scienter. *Id.* at 710.

**B.     The Anonymous "Confidential Witness" Allegations Do Not Give Rise to a Strong Inference of Scienter.**

**1.     Defendants' Awareness of Problems with the Consolidation Effort Is Not Inconsistent with Confidence that the Problems Could Be Overcome and the Projects Completed in a Reasonable Period of Time.**

As we argued in our moving brief, even assuming that Lead Plaintiffs' allegations regarding the consolidations are true and that some of the problems with the projects were communicated to the Individual Defendants, none of this creates the strong inference of scienter required to survive a motion to dismiss.  (Br. at 17-19; *see also id.* at 14 (citing *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) & *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).)  Lead Plaintiffs' argument can be boiled down to the following: (1) Defendants received reports identifying various problems with the consolidation projects; (2) Defendants' subordinates were directly involved in addressing the consolidation issues; (3) certain of Spectrum's customers ultimately threatened penalties against the Company; and (4) problems with the consolidations were well known within the Company.  (Opp'n at 36-44, 46-47.)  Even assuming these allegations are true, there is still a significant disconnect between such

---

(N.D. Cal. Mar. 29, 2013) (reasoning that defendant's "long-standing stock repurchase program rebuts a finding of scienter, since it is illogical that [defendant] would have been repurchasing its shares had it been aware of facts that would indicate the price would fall"); *In re Tibco Software, Inc.*, No. C 05-2146, 2006 WL 1469654, at *20 (N.D. Cal. May 25, 2006) ("[S]tock repurchase programs actually *negate* a finding of scienter."); *Mathews* v. *Centex Telemgm't, Inc.*, No. C–92–1837–CAL, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994) ("It would have made no sense to purchase that stock if defendants knew the prices to be inflated.").

facts and a securities fraud claim.  Simply put, Defendants could be aware of problems that were

being encountered, and yet could make honestly held, good-faith statements and predictions that

those problems were "transitory" and that the Company was making "good progress" in solving

them.  For example, even if Walmart had concerns about fulfillment rates and shipping times (*e.g.*,

Am. Compl. ¶ 132), such concerns do not mean that issues facing the Dayton and Edgerton

facilities were not temporary or transitory.  While the Amended Complaint may be lengthy, this

problem is pervasive throughout.  A few additional examples suffice to illustrate the point.  For

instance, Lead Plaintiffs allege the following based on information from comparatively low-level

employees, none of whom worked at corporate headquarters:

- "FE 3 confirmed that the Dayton Center opened without any racks, so pallets of inventory were stacked on the floor, 3-4 pallets high."  (Am. Compl. ¶ 67.)

- "[A]ccording to FE 3, the Dayton Center's inventory-management software did not track the age of products, information necessary to institute a FIFO program."  (Am. Compl. ¶ 80.)

- "FE 11 confirmed that when she visited the facility for the first time in April 2017 before accepting her position, there were few racks installed, only 5% of the approximately one-million-square-foot building was set up, and the distribution center was operating out of a trailer."  (Am. Compl. ¶ 99.)

- "Around early October 2017, FE 9 heard a senior executive express concern to FE 9's boss that the fill rate was about half of what it had been before the Company consolidated the distribution centers and that the fill rate was 'dismal.'"  (Am. Compl. ¶ 110.)

Even if true, and even if communicated to those who made public statements, none of the foregoing

leads to the conclusion that Defendants did not believe their statements about the progress of the

consolidations as of the dates they made their statements, or their prospects and potential benefits

to the Company in the future.

2.     **The Amended Complaint Fails to Adequately Allege that the Problems Identified and Reported by the Confidential Witnesses Were Contemporaneous with the Challenged Statements by Defendants.**

The disconnect between the Confidential Witness allegations and the Defendants' scienter is underscored when one looks at the time periods during which the Confidential Witnesses claim to have identified and complained of problems, compared to what the Defendants were saying *at that same time*.

As a starting point, many of the Confidential Witness allegations do not support an inference of scienter because they are entirely vague as to time. For instance, the Amended Complaint is silent about *when* at least 16 of the observations by the Confidential Witnesses about the Dayton consolidation (for Spectrum's GAC subsidiary) occurred. (*See* Am. Compl. ¶¶ 68, 69, 76, 80, 81, 82, 86, 89, 93, 111, 133, 134, 261, 266.) Likewise, the Amended Complaint provides no information about *when* at least 22 of the reports or complaints about the Edgerton consolidation (for Spectrum's HHI subsidiary) happened. (*See id*. at ¶¶ 69, 93, 95, 98, 108, 109, 118, 123, 124, 127, 129, 130, 136, 139, 264, 267, 268, 271.) Absent such a basic detail, this Court has no way to assess the accuracy of statements made by Defendants, let alone whether the statements were knowingly false. (*See* Br. at 7 (quoting *Sousa* v. *Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120-21 (D. Mass. 2017).)

With respect to the customer complaints involving Walmart, the Amended Complaint does not identify the dates of the meetings Lead Plaintiffs emphasize, but simply claims they happened "during late 2017," and then "again in 2018[.]" (Am. Compl. ¶ 132.) Lead Plaintiffs also cite alleged customer issues during 2018, but even if such issues arose in 2018, they cannot satisfy Lead Plaintiffs' pleading burden for statements made during 2017. (*Id*. at ¶¶ 113, 116.) In another example, FE 11 recalled conversations with a Vice President of Human Resources that "the Company was losing more employees than it could hire" at the Edgerton Center, but did

not specify when those conversations occurred.  (*Id.* at ¶ 271.)  The law is clear that where "it is difficult if not impossible to ascertain based on the [CWs] assertion when, precisely" relevant events are alleged to have occurred, such confidential statements will not suffice to support an inference of scienter.  *Plumbers & Pipefitters Local Union* v. *Zimmer*, 673 F. Supp. 2d 718, 737 (S.D. Ind. 2009).[2]

For the Confidential Witness allegations that provide more specificity as to time, we examine each time period in turn:

**January to March 2017**

The most that can be said about the allegations in the first quarter of the Class Period is that Defendants were optimistic about completing the consolidation projects, and, at the same time, there were some on-the-ground employees who observed that the centers were experiencing initial operating challenges (none of which is alleged to have been communicated to corporate headquarters).

The GAC consolidation was announced in the summer of 2016, and, as anticipated, the facility in Dayton, Ohio opened and started production on its first product line in January 2017. (*See* Br. at 6.)  In January 2017, Defendants observed on an earnings call that the GAC team was making "good progress" with the Dayton consolidation and predicted combining the business facilities into one location "is going to continue to help us with better managing inventories going forward."  (Dkt. 22-7 at 5; Am. Compl. ¶ 186.)  Martin also noted during this call that they had

---

[2]    *Accord Vallabhaneni* v. *Endocyte, Inc.*, 14-cv-01048, 2016 WL 51260, at *10 (S.D. Ind. Jan. 4, 2016) (dismissing Section 10(b) claim by concluding that "based on the vague testimony of the confidential witness, it is impossible to determine when [the defendant] knew that the [final drug] trials would not, or were not, demonstrating efficacy."); *City of Austin Police Ret. Sys.* v. *ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 943 (S.D. Ind. 2005) (finding with few exceptions, plaintiff did not provide dates for "when [CWs] acquired information they claim[ed] to possess," and thus concluding the CW allegations did not suffice to support an inference of scienter).

"already seen a nice impact in [the GAC] business."  (Am. Compl. ¶ 186.)

During this time period, just three Confidential Witnesses made observations about perceived problems at the Dayton Center—all of which focused strictly on the lack of racking in the Center.  For example, FE 3 stated that the Dayton Center opened without racks, resulting in a need to stack pallets, but this only became "untenable when *summer* arrived," because during summer some pallet cardboard weakened resulting in damaged inventory.  (Am. Compl. ¶ 67-68. (emphasis added).)  FE 4 stated that "it was bad from the beginning [January 2017]" and the Dayton Center did not have racking in January 2017.  (*Id.* at ¶ 72.)  FE 5 stated only that when she "visited the facility relatively early in her term (in spring 2017), she saw boxes and boxes of material stacked elsewhere."  (*Id.* at ¶ 67.)  None of these allegations about startup inefficiencies during the beginning of 2017, even if true, establish that any of Defendants knew their statements about the GAC consolidation to be false.

The same is true of the consolidation of the HHI facilities.  In January 2017, Spectrum announced its plan to consolidate the HHI division in Edgerton, Kansas.  (Br. at 9.) During this time, Defendants made optimistic, forward-looking predictions about this consolidation.  In February 2017, Rouvé predicted that "this project is going to be completed in the calendar year."  (Am. Compl. ¶ 188.)  In March 2017, Martin commented that they were "actually receiving product [in Edgerton] this week and we'll be fully shipping out of [the HHI] DC by the end of August." (*Id.* at ¶ 190.)  Spectrum also predicted that the Edgerton Center would be operational by May 2017 and fully exited by the end of calendar year 2017.  (*Id.* at ¶ 191.) Again, just three Confidential Witnesses make allegations about the HHI consolidation during this period—limited to the lack of racking and allegations about low fill rates.  (*Id.* at  ¶¶ 99, 106, 120.) FE 8 also asserted that the Edgerton consolidation was "the most disorganized plan [she had] ever

seen in [her] life and that it was impossible for the Consolidation to be successful based on where things stood in January 2017." (*Id.* at ¶ 89.)

These allegations fail to establish scienter. *First*, even if true, they do not contradict Defendants' predictions about the Edgerton Center's completion date. *Second*, these allegations are not inconsistent with Defendants' own statements, as Defendants explicitly predicted that the Edgerton Center would be operational in *May 2017* and ready to fully ship out products in *August 2017*, and said absolutely nothing about the Edgerton Center's readiness in January, February, or March 2017. Lead Plaintiffs thus fail to allege that Defendants made any knowingly false statements during these first few months of the proposed Class Period regarding the current positive progress of the Edgerton Center.

**April to June 2017**

During the next few months in 2017, Spectrum made statements about the "good progress" it was making on its improvement initiatives, including statements that these projects were "going well." (*Id.* at ¶¶ 194-95.) Spectrum also made statements that the consolidations were "on track" and would reduce expenses and inventory. (*Id.* at ¶ 196.) The Confidential Witnesses make almost no specific allegations at all about the Dayton Center during these three months. The only allegation made during this time frame is that in June 2017, when one former employee began at Spectrum, she personally, and subjectively *estimated* that the Operating Equipment Efficiency (tracking when a machine is up and running) at the facility was 30% lower than her perceived "goal" based on her prior work experience. (*Id.* at ¶ 64.) Regarding the Edgerton Center, the Confidential Witness allegations are limited to the lack of racking and that Spectrum used semi-trailers in the facility parking lot to store some of its inventory. (*See id.* at ¶¶ 99, 102, 117, 199.) FE 8—who left the Company in May 2017—also asserted that Spectrum's

May 17, 2017 statement that its Edgerton Center was generally "on track" was "not a truthful statement" because "at no time was the project on schedule."  (Am. Compl. ¶ 117, Appendix B.)[3] FE 8, of course, has no insight into anything that happened after she left, and her conclusory and vague allegation fails to establish scienter regarding any of Spectrum's statements about the projected future completion.[4]

**July 2017 to February 2018**

   During the middle of the proposed Class Period, Spectrum informed investors that while the Company was making good progress on completion of the consolidations, it was also experiencing problems with the projects, albeit temporary ones.  The Confidential Witness allegations do not undermine the characterization of the problems as "transitional."  For example, in July 2017, Rouvé stated that they "experienced temporary, transitional supply chain challenges" with the Edgerton and Dayton consolidations affecting "shipping levels in the short term," but that the projects were still "on schedule and the issues are being quickly addressed."  (*Id.* at ¶ 201.)  In February 2018, Martin acknowledged that there were "operating startup cost inefficiencies" and "higher-than-normal customer backlog," but stated that they were "beginning to ease."  (*Id.* at ¶ 226.)  While the Confidential Witness statements raise various allegations about the projects during this period, they do not, as a matter of law, give rise to the inference that when Defendants said the problems were "transitional," were "being quickly addressed," and were "eas[ing]," that the Defendants made such statements with an intent to deceive.  (*See* Section I.B.1, *supra*.)

---

[3] Note that Defendants could not identify any May 17, 2017 statement Spectrum made about the Edgerton Center being "on track," nor does the Amended Complaint discuss one.  Lead Plaintiffs may be referring to a statement Spectrum made on May 2, 2017.  (*See* Am. Compl. ¶ 194.)

[4] Further, by way of just one example, later statements such as FE 18's claim that "[b]y May 2018, [Spectrum's] fulfillment rates were nowhere near 90%" say nothing about any of Defendants' knowledge of fulfillment rates *before* May 2018.  (*Id.* at ¶ 146.)

**March to November 2018**

Lead Plaintiffs' allegations regarding Defendants' scienter at the end of the proposed Class Period fail for a different but related reason.  During this period, Spectrum recognized that there were ongoing operational problems, and continued its effort to improve them, particularly after Maura took over as CEO.  While Defendants disclosed progress on the consolidation efforts, they did not sugarcoat the situation but informed the market of the continuing problems and how they planned to go about resolving them.  In April 2018, Maura noted that "[w]e believe the U.S. facility operating inefficiencies are transitory in nature and the adverse margin impact from them is temporary."  (Am. Compl. ¶ 236.)   In July 2018, Maura noted that the "turnaround of our HHI and GAC business units is well under way" and Spectrum "benefited from markedly reduced order backlogs in Kansas and Dayton," as they "continue[d] to improve the efficiency of the Kansas and Dayton facilities."  (*Id.* at ¶ 244.)  While the Confidential Witnesses perceived the problems to be worse than Defendants, or perceived that Defendants were not doing a sufficient job addressing the issues, their allegations fail to establish that Spectrum's optimistic statements about its improvement efforts were made with the knowledge that they were false.

> **3.**     **The Amended Complaint Fails Adequately to Allege that the Defendants Knew About Many or All of the Problems Identified by the Confidential Witnesses.**

Lead Plaintiffs have not sufficiently pleaded facts indicating that the Defendants actually knew any particular piece of information that is attributed to the Confidential Witnesses. (*See* Br. at 15-17.)  The Confidential Witnesses on whom Lead Plaintiffs rely do not have any first-hand information about what the Defendants knew about the consolidations.  The following statements are illustrative of how Lead Plaintiffs strain to connect the Confidential Witnesses with any of the Defendants:

- According to FE 11, an Edgerton Operations Team member, "[daily reports indicating shipment delays] were available via the Company software used to manage operations, and David Booher, a Senior Vice President who reported to HHI's General Manager, who reported to Defendants Rouvé and Maura, had access to these numbers." (Am. Compl. ¶ 124.) This does not establish the required strong inference that Defendants Rouvé and Maura had the relevant information about shipment delays.

- FE 18, a Senior Accountant in Spectrum's Middleton, Wisconsin office, "stated that she knew that reports showing that 40-50% of payments to vendors were late because of GAC's and HHI's inability to track their inventory and vendors threatening to stop servicing the distribution centers were presented by her boss to the C-suite, including Defendants Martin, Rouvé, and Maura." (Am. Compl. ¶ 259.) This, perhaps the most direct allegation tied to the Individual Defendants, is entirely second hand; the Confidential Witness does not say what was actually discussed with the Defendants.

- "Numerous former employees" allegedly claim that "the problems with late shipments and customer fines were well known throughout senior management at the [Edgerton] Center." (Am. Compl. ¶ 264.) This is generic hearsay and does not satisfy Rule 9(b), and in any event, speaks only to senior management at the Edgerton Center, and not the corporate leadership named in the Amended Complaint.

- FE 8, an Internal Consultant, claims that she "participated in quite a few monthly status meetings" regarding "distribution center issues" with unidentified middle management "from headquarters in Middleton" who "reported directly to Defendants Rouvé and Maura[.]" (Am. Compl. ¶ 267.)

Lead Plaintiffs also do not advance *any* allegations that the Individual Defendants were actually aware of issues relating to purported complaints from Spectrum's customers, including Walmart, Lowe's, and Home Depot. Instead, as with the other Confidential Witness allegations, Lead Plaintiffs simply allege that lower- or middle-management were aware of these issues (such as, for example, the Vice President of Sales and Marketing). Lead Plaintiffs failure to sufficiently allege that the Defendants knew about the problems discussed by the Confidential Witnesses is fatal to the scienter allegations in the Amended Complaint.

**C.** **The Other Allegations in the Amended Complaint Fail to Give Rise to a Strong Inference of Scienter, and Spectrum's Conduct Refutes Such an Inference.**

Lead Plaintiffs advance a host of other arguments in support of their contention that they have adequately alleged scienter. None have merit.

They contend that the consolidations "Were Critically Important to the Company" and thus the Individual Defendants are legally presumed to know the facts critical to Spectrum's core operations. (Opp'n at 41-42.) This is simply not the law. All of the cases on which Lead Plaintiffs rely are distinguishable because each case cited described facts from which the actual knowledge of the defendants could be inferred. None of these cases stand for the proposition that it is sufficient that the subject matters of the misstatements were "important" to the company. (*See* Opp'n at 42.)[5]

The Amended Complaint also alleges that Rouvé's firing supports an inference of scienter. (Opp'n at 44-45.) To the contrary, as courts around the country have recognized, the fact that an officer resigns or is fired during the proposed Class Period is not sufficient to create a strong inference of scienter at the pleading stage.[6]

---

[5] Lead Plaintiffs repeatedly omit the facts that make these cases readily distinguishable. For example, in *Construction Workers Pension Fund-Lake County & Vicinity* v. *Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 662 (N.D. Ill. 2015), the district court concluded scienter was supported with allegations that the CEO attended monthly meetings in which product engineers directly discussed with him the problems the company had in achieving Environmental Protection Agency emissions standards while, during that same time, the CEO stated to investors that the technology "is already proven." *Navistar*, 114 F. Supp. 3d at 661-62. Lead Plaintiffs' other cases on the point are similarly inapplicable. *See Tellabs III*, 513 F.3d at 706 (addressing company's statements about its "principal product, accounting for more than half its sales"); *Shenk* v. *Karmazin*, 867 F. Supp. 2d 379, 384 (S.D.N.Y. 2011) (discussing merger between the only two satellite radio broadcasters in the US that resulted in over $3 billion in debt for the remaining company); *Schleicher* v. *Wendt*, 529 F. Supp. 2d 959, 962 (S.D. Ind. 2007) (involving the company's $6 billion acquisition of another company, including taking on $3.6 billion in debt the year after to cover losses from the acquired company).

[6] *See Roth* v. *OfficeMax, Inc.*, No. 05 C 236, 2006 WL 2661009, at *5 (N.D. Ill. Sept. 13, 2006) (dismissing 10(b) claims against individual defendants even where the President, Vice President and Controller, CFO and other officers resigned during the class period); *Comms. Workers of Am.* v. *CSK Auto Corp.*, 2007 WL 951968, at *6 (D. Ariz. 2007) ("Neither a resignation nor a termination by itself gives rise to a strong inference of scienter.").

Finally, Lead Plaintiffs argue that that the Individual Defendants' "frequent" discussions of the consolidations supports a finding of scienter. (Opp'n at 45-46.) Defendants did indeed update the market about the Dayton and Edgerton facilities on investor calls, and also discussed various issues they were experiencing with the projects. (Br. at 20-21.) However, keeping investors informed about project developments reflects candor and transparency, not deceit.[7]

### D.    Defendants Have Offered a Compelling Competing Inference that Refutes a Finding of Scienter.

Lead Plaintiffs contend that Defendants have failed to offer a competing inference negating scienter. (Opp'n at 47-51.) This turns Plaintiffs' pleading burden on its head: it is *Lead Plaintiffs* who are obligated to plead particularized facts giving rise to a strong inference of scienter. Of course, Defendants may, in the face of those facts, offer an alternative interpretation of those facts, and a complaint for securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 2503. Here, as discussed in Section I.B. above, Defendants' competing inference refuting scienter is simple: Defendants had a good-faith belief when they told the market they were making progress, had turned a corner, and the like, that they had in fact done so. In the face of two massively complex distribution projects, involving hundreds of discrete products, it is at least as compelling to infer that the projects simply turned

---

[7]    The authorities Lead Plaintiffs cite do not suggest that frequent reference to an issue supports an inference of scienter, but rather, at best, supports the notion that the frequency of statements is but one factor a court could consider, among others. *See, e.g.*, *Schleicher*, 529 F. Supp. at 979 (holding that "[t]he combination of the nature, duration, scope, and financial magnitude of the alleged misstatements and omissions provides a sufficient foundation for the required strong inference of fraudulent intent or scienter"). Thus, the mere fact that over a two-year period, Defendants addressed various issues about the consolidations multiple times does not support scienter.

out to be more difficult or time-consuming than initially anticipated, and that Defendants' optimism was honestly held but, in hindsight, misplaced.

## II.     The Amended Complaint Fails to Allege that Certain of Spectrum's Statements About Its Consolidation Projects Were False.

Defendants attached a chart to their moving brief summarizing their response to each alleged false statement cited in the Amended Complaint. (*See* Dkt. 22-1.) In that chart, Defendants demonstrated that Lead Plaintiffs had failed to allege the falsity of 37 of the challenged statements. Lead Plaintiffs' opposition brief does not rescue these allegations. (Opp'n at 22-24.)

*First*, the opposition brief argues that statements that are "technically" or "literally" true are nonetheless false. This proposition is as illogical as it sounds, and is unsupported by the law. The very example cited in the opposition brief illustrates this point: Lead Plaintiffs concede that Defendant Martin's statement that the Edgerton Center was "operational" in June 2017 was "technically true" because the facility was receiving product, but contend it was nonetheless false because the facility still faced a number of problems. (Opp'n at 22-23.) A facility, of course, can be operational without being problem-free. Lead Plaintiffs' argument is not improved by their misreading of the case law: the authorities they rely upon simply stand for the uncontroversial proposition that assessing whether a statement is misleading requires an assessment of the *context* in which the statement was made. None of these authorities stands for the nonsensical proposition that a statement that is actually true is also false.[8]

Lead Plaintiffs also ask this Court to measure Defendants' statements against a nonexistent objective standard. The Amended Complaint alleges that Defendants misled the

---

[8]     *See Stransky* v. *Cummins Engine Co., Inc.*, 51 F.3d 1329, 1332 (7th Cir. 1995) (emphasizing that Rule 10b-5 includes the contextual language that statements must be assessed "in light of the circumstances under which they were made"); *McMahan & Co.* v. *Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (holding that statements must be assessed together and in context); *SEC* v. *First Am. Bank & Trust Co.*, 481 F.2d 673, 678 (8th Cir. 1973) (holding that a statement that a banking institution was "bonded and insured" misled investors into thinking deposits were insured by the FDIC).

market when they announced that it was experiencing "temporary" and "transitory" issues. (Opp'n at 23-24; Am. Compl. ¶¶ 204, 225.) Lead Plaintiffs do not define what makes an issue "transitory," or when an issue is no longer "temporary," only alleging that the problems in Edgerton and Dayton do not qualify as either. These vague assertions cannot sustain the Amended Complaint.

*Second*, a careful reading of the Amended Complaint shows that Spectrum is never actually alleged to have made a false statement about the projects' progress. Defendants' statements regarding the progress of the consolidation projects are, by their nature, not objectively measurable, and those statements were not made false by the fact that the consolidations took longer than expected. *See Stransky*, 51 F.3d at 1332 ("[A] statement true when made does not become fraudulent because things unexpectedly go wrong").

The Amended Complaint thus fails to plead particular facts to allege that Defendants' statements that the GAC consolidation was "making good progress" and "progressing smoothly," and similar statements that the HHI consolidation was "making good progress" and "on track," were false *when those statements were made*. (Opp'n at 18; Am. Compl. ¶¶ 186, 191, 194-197.) Lead Plaintiffs also fail to provide any metric by which to measure whether Spectrum was in fact making "good progress" on the consolidation projects. The opposition brief does not— and cannot—cure that fundamental flaw of the Amended Complaint.

The opposition brief alleges that the statements about "progress" were false because they were inconsistent with Spectrum's purported internal schedules, but the Amended Complaint is completely inconsistent when it comes to defining what these supposed schedules actually were. For example, the Amended Complaint alleges at one point that Spectrum's internal schedule was to complete the Dayton Center by January 2017. (Am. Comp. at ¶ 59.) Two paragraphs later, the Amended Complaint cites a Confidential Witness who claims the Dayton Center was to be

17

completed by July 2017.  (*Id.* ¶ 61.)  In reality, throughout the proposed Class Period, Spectrum updated the market regarding the status of the consolidation projects as issues arose and new information became available.  As a consequence, the Amended Complaint does not allege with specificity that, at any particular time, when the Company reported to the market that things were "on schedule" or "on track," it spoke falsely.

*Third*, Lead Plaintiffs advance a number of factual assertions that are demonstrably false.  The opposition brief claims that Spectrum "abandoned the HHI and GAC Consolidations altogether," (Opp'n at 23-24) but Spectrum did complete the consolidations of both the Dayton and Edgerton facilities.  (Dkt. 22-15 at 7 (completion of GAC); Rosen Decl. Ex. 1 at 20 (completion of HHI).)[9]  Lead Plaintiffs also repeatedly allege that Spectrum did not close its HHI West Coast facility in Mira Loma, California.  Lead Plaintiffs appear to simply be confused:  while a distribution facility for a subsidiary of HHI, Tell Manufacturing, remains open, the HHI facility was in fact closed.

## III.   Certain Statements Regarding the Consolidation Projects are Forward-Looking Statements Protected by the PSLRA's Safe Harbor.

Defendants identified 26 allegedly false statements as protected by the PSLRA's safe harbor provision.  In response, Lead Plaintiffs address just 12 of the 26, effectively conceding that the other 14 are, in fact, protected by the safe harbor provision.  As to those 14 statements, Lead Plaintiffs have waived any argument and those statements should be dismissed from the case.[10]  (*Compare* Br. at 26-32 & Dkt. 22-1 at 7-9 *with* Opp'n at 25 & Dkt. 53-1.)

---

[9]   The Court also may take judicial notice of documents in the public record, including filings with the Securities and Exchange Commission.  *See Pugh* v. *Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008).

[10]   *See, e.g.*, *CMFG Life Ins. Co.* v. *UBS Sec.*, 30 F. Supp. 3d 822, 831 (W.D. Wis. 2014) (holding that plaintiff waived statute of limitations argument by failing to address the argument in its opposition brief); *Mart* v. *Forest River, Inc.*, 854 F. Supp. 2d 577, 592-93 (N.D. Ind. 2012) (citing *Bonte* v. *U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)) (holding that plaintiff's failure to respond to some arguments in defendant's motion to dismiss waived further challenge to those arguments).

With respect to the remaining 12 statements, Lead Plaintiffs misstate the law, and then misapply that misstated law to those 12 statements.  Lead Plaintiffs incorrectly contend that the standard set forth in the text of the PSLRA is conjunctive, rather than disjunctive.  (*See* Opp'n at 24.)  But, as Defendants showed in their moving brief, the standard is disjunctive:  the PSLRA protects forward-looking statements *either* if they are (1) accompanied by meaningful cautionary statements, or (2) were not made with "actual knowledge" that the statement was false or misleading.  (*See* Br. at 27.)[11]

## A.    The Challenged Statements Are Forward-Looking.

Lead Plaintiffs attempt to redefine what constitutes a forward-looking statement by contending, incorrectly, that "mixed present and future statements" are not protected by the PSLRA safe harbor provision.  That is not the law.  A forward-looking statement is a statement for which the truth or falsity is not discernible until after the statement is made.  *E.g.*, *Julianello* v. *K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015) ("The critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made . . . ."); *Harris* v. *Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) ("[A] statement about the state of a company whose truth or falsity is discernible only after it is made necessarily refers only to future performance.").  The PSLRA itself defines forward-looking statements to include "any statement of the assumptions underlying or relating to any statement" in the foregoing.  15 U.S.C. § 78u-5(i)(1)(A)-(D).  Courts in this Circuit have thus held, relying on this provision in the

---

[11]    *See also* 15 U.S.C. § 78u-5(c)(1); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 994 (E.D. Wis. 2009) ("[A] forward-looking statement unaccompanied by meaningful cautionary language may still qualify for safe harbor if the plaintiff cannot prove the defendants had 'actual knowledge . . . that the statement was false or misleading.'") (quoting 15 U.S.C. § 78u-5(c)(1))); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1162 (N.D. Ill. 2004) ("If a forward-looking statement has no accompanying cautionary language, the safe harbor may still apply if the plaintiff fails to prove that the defendant made the statement with 'actual knowledge' that it was 'false or misleading.'").

PSLRA, that a statement about the present is covered by the safe harbor where that statement is an assumption underlying a forward-looking statement.[12]

The 12 statements that Lead Plaintiffs assert are mixed present/future statements are protected by the safe harbor provision because either:  (1) their truth or falsity could not be determined until after the statements were made; or (2) those statements were assumptions underlying forward-looking projections.  To illustrate the first category: the truth or falsity of the statement that the Dayton consolidation will "continue to help us with better managing inventories going forward," cannot be determined until after the consolidation was complete.  (Am. Compl. ¶ 186.)  To illustrate the second: Spectrum stated in its first-quarter 2018 earnings call presentation that the "Dayton consolidation [is] now complete in time for [a] large spring and summer demand season, expected to deliver both cost savings and improved working capital."  The last clause of this sentence clearly represents an assumption underlying Spectrum's forward-looking projections relating to cost savings and improved working capital.  (Am. Compl. ¶ 228.)  Lead Plaintiffs' challenges to other statements that were assumptions underpinning forward-looking statements fail for the same reasons.  (*See* Am. Compl. ¶¶ 190, 194, 197, 203, 217, 218.)

Finally, to the extent Lead Plaintiffs argue that the challenged statements are statements of present fact simply because they are phrased in the present tense, they are incorrect. *Tellabs III*, on which they rely, noted that "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present," *but also* stated that the fact that any challenged statements "are in the present tense is not decisive on the question

---

[12]   *See Desai* v. *Gen. Growth Props.*, 654 F. Supp. 2d 836, 851 (N.D. Ill. 2009) (holding that defendant's present statements about investments fell under the safe harbor because they were assumptions explaining defendant's forward-looking statements); *W. Pa. Elec. Emps. Pension Trust* v. *Plexus Corp.*, No. 07C0582, 2009 WL 604276, at *8 n.6 (E.D. Wis. Mar. 6, 2009) (finding that plaintiff challenged a statement of "present fact" that "is one of the assumptions underlying [defendant's] projections for the next quarter, and therefore is also forward-looking").

whether the statements include predictions." *Tellabs III*, 513 F.3d at 705.  In other words, forward-looking statements can be phrased in the present tense and still be protected under the safe harbor provision.[13]

**B.      Defendants' Forward-Looking Statements Were Accompanied by Detailed Risk Disclosures Addressing the Specific Risks that Came to Pass.**

Lead Plaintiffs also contend that Defendants' forward-looking statements were not accompanied by meaningful cautionary language, asserting that Defendants' risk disclosures were "broad, boilerplate disclaimers that warned of a vast universe of possible hypothetical factors." (Opp'n at 26.)  Lead Plaintiffs principally focus on Defendants' disclosure that "actual results or outcomes may differ."   But they do not address the *five other specific risk factors* Defendants identified.  (Br. at 30-31.)  Those other risk factors expressly identify the principal contingencies that could have led to bad outcomes.  Three of them are reproduced here:

- Our ability to successfully implement, achieve and sustain manufacturing and distribution cost efficiencies and improvements, and fully realize anticipated cost savings.  (Br. at 30.)

- The impact of expenses resulting from the implementation of new business strategies, divestitures or current and proposed restructuring activities.  (*Id.*)

- We expect to incur one-time costs in connection with integrating our operations, products and personnel and those of businesses we acquire into a combined company, in addition to costs related directly to completing such acquisitions. These costs may include expenditures for:  employee redeployment, relocation or severance; integration of operations and information systems; combination of research and development teams and processes; and reorganization or closures of facilities.  (*Id.*) (emphasis added.)

---

[13]   As a result, statements that the consolidations were "moving forward" or "moving toward" completion are present tense statements about the anticipated, future completion of the consolidations.  (Am. Compl. ¶¶ 224, 225, 227.) Likewise, the statement that changes at the HHI distribution center would "continue to work down the order backlog" was a present tense statement regarding Spectrum's projection about reducing the backlog going forward.  (Am. Compl. ¶ 248.)  *See Navistar Int'l*, 114 F. Supp. 3d at 649-50 ("As the Seventh Circuit has pointed out, the fact that a challenged statement is phrased in the present tense does not necessarily mean that the statement is one of present conditions rather than a prediction of future events."); *Desai*, 654 F. Supp. 2d at 848 ("[V]erb tense is not conclusive in deciding whether a statement is forward-looking.").

These risk factors were hardly boilerplate. They provided detailed and focused information tailored to the risks associated with manufacturing and distribution efficiencies and improvements.[14] Lead Plaintiffs' attempt to dismiss them as mere boilerplate is thus unavailing.

Finally, even if the forward-looking statements were not accompanied by meaningful cautionary language (and they were), they are nonetheless not actionable because Lead Plaintiffs do not allege with specificity that the statements were made with "actual knowledge" that they were false or misleading for the reasons set forth above in Section I, discussing scienter.

## IV.    Defendants' Statements About the Consolidations Are Non-Actionable Opinions.

Defendants demonstrated in our moving brief that many of the statements Lead Plaintiffs challenge are statements of opinion, and therefore not actionable. (*See* Br. at 33-39.) Each of Lead Plaintiffs' opposition arguments is unpersuasive:

*First*, Lead Plaintiffs contend that the challenged statements are not opinions at all, but rather, statements "of current fact," and that the statements do not "refer to 'opinion,' 'belief,' or any other terms indicating that they are opinions." (Opp'n at 27.) In fact, a number of the challenged statements expressly use terms like "I believe" to indicate that they are opinions and not statements of fact:

- "It is our firm **belief** that the current impact to our free cash flow is mostly transitory and largely reflects one-time investments in working capital and customer relationships." (Am Compl. ¶ 236.)

- "We **believe** the U.S. facility operating inefficiencies are transitory in nature and the adverse margin impact from them is temporary.'"). (*Id.*)

---

[14]    *Asher* v. *Baxter International*, 377 F.3d 727, 729 (7th Cir. 2004) does not support Lead Plaintiffs' position that Spectrum's cautionary language "did not disclose the risks that, at the time of the statements, were the important source of variance[.]" (Opp'n at 26.) In *Asher*, the court held that the cautionary language was inadequate because "the major risks [the company] objectively faced when it made its forecasts were exactly those that . . . came to pass, yet the cautionary statement mentioned none of them." *Id.* at 734. Here, the very risks that the company faced were precisely disclosed.

- "We **believe** the HHI and GAC operating inefficiencies are transitory in nature . . . and the adverse margin impact is largely behind us[.]")  (*Id.* at ¶ 237.) (emphasis added.)

More fundamentally, though, it is not the law (and Lead Plaintiffs cite none) that a statement of opinion requires any magic words such as "belief" or "opinion."  Common sense dictates that a statement may be one of judgment—i.e., an opinion—where it offers a subjective view, such as:

- Optimistic statements about the progress being made on the consolidations, such that Defendants thought the projects were "progressing smoothly" or "in good shape";

- Statements that the Defendants believed the issues with the projects were "temporary" or "transitory in nature"; and

- Statements that Defendants "would consider this transition to be a fairly normal one with normal startup issues."

(*See* Br. at 33.)

Lead Plaintiffs contend that *Perez* v. *Higher One Holdings, Inc.*, No. 14-cv-755 (AWT), 2016 WL 6997160 (D. Conn. Sept. 13, 2016), relied upon in Defendants' moving brief, "directly conflicts with numerous cases in the Seventh Circuit."  (Opp'n at 27 n.9.)  But the cases Lead Plaintiffs cite: *Tellabs III* and *Public Employees' Retirement System of Mississippi* v. *TreeHouse Foods, Inc.*, No. 16 C 10632, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018), are inapplicable on this point.  *Tellabs III* does not address whether the challenged statements (that demand for a product was "still going strong" and the company "should hit [its] full manufacturing capacity . . . in May or June") were opinions, but instead analyzed them under the safe harbor for forward-looking statements.  513 F.3d at 705-06.  *TreeHouse Foods* is the same:  there, the district court concluded that the company's statement about being "solidly on track to deliver the earnings"

was not protected by the safe harbor for forward-looking statements, without discussing opinion liability.[15]

      *Second*, Lead Plaintiffs assert that even if the challenged statements are deemed opinions, they are still actionable under the three exceptions set forth in *Omnicare*. To the contrary, none of those exceptions apply:

      The first *Omnicare* exception requires that the person or entity expressing the opinion does not actually hold that belief. *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indust. Pension Fund*, 135 S. Ct. 1318, 1326-28 (2015). This argument fails for the reasons set forth in Section I, *supra*, discussing scienter.

      The second *Omnicare* exception requires a showing that the person or entity speaking has omitted facts underlying the opinion to such a degree that the opinion itself becomes misleading. *Id.* Here, Lead Plaintiffs appear to acknowledge that Defendants may "not [have been] actually aware of all the details of the pervasive, persistent problems at each of the Centers," but instead suggest that Defendants should have conducted a "reasonable inquiry," which would have led them to learn of the alleged issues. (Opp'n at 29.) But Spectrum's statements about making "good progress" or "temporary" issues did not imply that there were no problems with the consolidations projects. Far from misleading investors, Spectrum repeatedly told investors about issues with the consolidation projects.

      As *Omnicare* noted, "reasonable investors understand that opinions sometimes rest on a weighing of competing facts" and "[a] reasonable investor does not expect that *every* fact

---

[15]   Lead Plaintiffs fail to distinguish the statements at issue here from *Tongue* v. *Sanofi*, 816 F.3d 199, 206 (2d. Cir. 2016), cited in Defendants' moving brief. In *Tongue*, the court held the statement "I would say I'm actually very satisfied with where the progress is going" was a statement of opinion. *Id.* at 206. Lead Plaintiffs contend that in this case, "the timing-related statements were objectively incorrect because Defendants were aware that the GAC and HHI consolidations were off schedule per the Company's own internal deadlines." (Opp'n at 27 n.9.) But there is nothing contradictory about statements regarding "good progress" and the possibility of not finishing the projects before the initial projected completion date.

known to an issuer supports its opinion statement."[16]  135 S. Ct. at 1329 (emphasis in original).

Lead Plaintiffs' argument flies in the face of the Supreme Court's instruction that this exception

should "not be given an overly expansive reading," and that "establishing liability [under this

exception] is no small task for an investor to meet."  *Okla. Firefighters Pension & Ret. Sys.* v.

*Xerox Corp.*, 300 F. Supp. 3d 551, 567 (S.D.N.Y. 2018) (quoting *Omnicare*, 135 S. Ct. at 1332)

(quotation marks omitted).

The third *Omnicare* exception requires that the opinion contains a false "embedded

statement[] of fact."  *Omnicare, Inc.*, 135 S. Ct. at 1326-28.  Lead Plaintiffs argue that the

statements that the consolidations were "progressing smoothly" and that any startup issues were

"normal" and "temporary," "necessarily implied the embedded facts that GAC and HHI were

smoothly fulfilling customer orders and that management was effectively addressing the 'issues.'"

(Opp'n at 28.)  These statements imply no such facts.  It can be true *both* that there was "progress"

with the consolidation projects and that there were "normal" startup issues that management

deemed "temporary," *and* that some issues still remained to be resolved, such as issues relating to

the fulfillment of customer orders.

## V.    Several of Defendants' Statements About the GAC and HHI Consolidations Were Vague and Optimistic Puffery, Not Actionable Under the Securities Laws.

Lead Plaintiffs advance several arguments in support of their position that a number

of the challenged statements were not simply vague and optimistic puffery, but are instead

actionable.  (Opp'n at 30-34.)  None have merit:

---

[16]    Lead Plaintiffs argue that they did provide metrics against which the Defendants should have relied on in forming their opinions about progress and temporary issues with the consolidations.  They point to Confidential Witness allegations that Spectrum did not install adequate racking and a few individuals' personal views that the scrap rate was too high and the fill rates were too low.  (Opp'n at 29-30.)  But Lead Plaintiffs fail to show that Defendants adopted these metrics as their own or that the reasonable investor would have judged "progress" according to these nebulous standards.

*First*, Lead Plaintiffs assert that this Court should not make a determination, on the pleadings, that any of Defendants' statements were puffery.  (Opp'n at 30.)  That contention is directly contrary to numerous cases within and without the Seventh Circuit in which courts have dismissed complaints at the pleading stage for that very reason.  As the court in *Midway Games*, 332 F. Supp. at 1164, held, "plaintiffs' argument [that puffery is not properly decided on the pleadings] ignores several appellate decisions affirming dismissal at the pleadings stage because the allegedly false or misleading statements were immaterial as a matter of law."[17]  Lead Plaintiffs rely principally on *Marks* v. *CDW Computer Centers, Inc.*, 122 F.3d 363 (7th Cir. 1997), but that case did not involve the doctrine of puffery at all.  There, at summary judgment, the Seventh Circuit reached the unremarkable conclusion that the materiality defense would require a jury to weigh competing inferences.  *Id.* at 370.  In contrast, the puffery doctrine is routinely decided on the pleadings because it holds that no reasonable investor could find generic statements of optimism actionable as a matter of law.  *See, e.g.*, *Van Noppen*, 136 F. Supp. at 940.

*Second*, Lead Plaintiffs fail to meaningfully respond to the numerous courts around the country that have held that statements like "on track," "good progress," or "transitory" are puffery.  *See, e.g.*, *In re Arantana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757-58 (S.D.N.Y. 2018) (concluding that defendant's statements about being "on track" to deliver products to market was "no more than place a positive spin on developments" (quotation marks omitted)); *Wozniak* v. *Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (holding that the statement that the company was "very pleased with [its] progress to date on key strategic

---

[17]  *See, e.g.*, *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (affirming district court's decision, on a motion to dismiss, that several statements were puffery); *Lloyd* v. *CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (holding that district court properly determined, on the pleadings, that certain of defendant's statements were puffery); *Van Noppen* v. *InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 941-43 (N.D. Ill. 2015) (holding that several statements constituted "immaterial puffery" on a motion to dismiss).

26

initiatives" was puffery); *Rochester Laborers Pension Fund* v. *Monsanto Co.*, 883 F. Supp. 2d

835, 882 (E.D. Mo. 2012) (holding that statements about being "on track" to "reaching the

predicted goals of gross profitability" was puffery); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d

871, 898 (D. Minn. 2007) (concluding the phrase "'[r]emarkable progress' is a vague term, not

subject to objective proof," and is therefore puffery); *City of Warwick Mun. Emps. Pension Fund*

v. *Rackspace Hosting, Inc.*, No. 17 CIV. 501 (JFK), 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5,

2019) (finding statements that company "made good progress this year" was "inactionable

puffery").

        *Third*, Lead Plaintiffs rely on a number of distinguishable cases for support of their

assertion that the statements Defendants identified as puffery are not, in fact, puffery. Those cases

do not establish that the challenged statements were not puffery, nor do they contradict the

numerous cases cited in Defendants' moving brief (and above).[18]  For example:

- In *In re HD Supply Holdings, Inc. Securities Litigation*, 341 F. Supp. 3d
  1342, 1353 (N.D. Ga. 2018), the court actually held that certain of the
  challenged statements *were* immaterial: defendant's statements that the
  company had "significant momentum" and that he was "confident in the
  progress" made. *Id.* at 1359-60.

- In *Silverman* v. *Motorola*, No. 07 C 4507, 2008 WL 4360648, at *10 (N.D.
  Ill. Sept. 23, 2008), the court did not hold that statements about a business
  project being "on track" were categorically material, but instead held that
  such statements "would be material if in fact defendants knew that those
  statements were not on track."  Here, Lead Plaintiffs have failed to allege
  that Defendants knew their statements about the consolidations were false
  when made.

- In *In re Akorn, Inc. Securities Litigation*, 240 F. Supp. 3d 802, 817 (N.D.
  Ill. 2017), the court relied on *Silverman* for holding that the phrasing "on
  track" is not puffery, but the court failed to acknowledge *Silverman*'s

---

[18]  Defendants identified three categories of statements that were immaterial puffery in their moving brief: (1) generic, positive statements about the progress made toward completing the consolidations; (2) statements about the consolidation issues being transitory; and (3) general statements of enthusiasm about the impacts the consolidations had on Spectrum's business.  (Br. at 40-42.)

reasoning that "on track" only would be material if the defendant *knew* the statement was false.

- In *Desai*, 654 F. Supp. 2d at 852, the court's ruling related to the applicability of the PSLRA's safe harbor provision, and not whether the challenged statement, regarding the company's ability to repay or refinance its debt, was immaterial puffery at all.

*Fourth*, Lead Plaintiffs argue, in a conclusory fashion, that vague and indefinite statements regarding "progress" at the Dayton and Edgerton facilities, and expressing "enthusiasm" about the "positive impact" the consolidation projects had on Spectrum's business, are actionable misrepresentations, and cite to market analyst reports for support. (Opp'n at 32-34.) But the support is illusory: for example, Lead Plaintiffs refer to an Oppenheimer & Co. analyst report crediting the consolidation issues as temporary (Am. Compl. ¶ 176), as purported support for their contention that the market relied on Defendant Maura's statement that the issues were "transitory." (Am. Compl. ¶ 160.) But the challenged statement by Maura was made after *second*-quarter earnings were announced, while the analyst report was issued after *third*-quarter earnings were announced—which were positive and, if anything, proved the *truth* of Maura's assessment a few months earlier, that the issues were transitory. (Am. Compl. ¶ 176 ("SPB posted *good results today*, essentially *confirming* that the issues last quarter were transitory[.]") (emphasis added).)[19]

Lead Plaintiffs' additional reliance on *TreeHouse Foods*, 2018 WL 844420, at *2-3, is particularly misplaced. The challenged statements in *TreeHouse Foods* related to an $854 million acquisition and the resulting integration of that acquisition into the defendant's business. *Id.* at *2. Statements relating to a nearly $1 billion acquisition are utterly distinguishable from

---

[19]   Lead Plaintiffs' opposition brief incorrectly refers to this report being issued after the second-quarter earnings results were announced. (Dkt. 52, Opp'n at 32.)

generalized comments that the consolidations at issue here would have a "positive impact" on Spectrum's business.

*Finally*, for the reasons set forth in Part I, *supra*, discussing scienter, Lead Plaintiffs have failed to adequately allege that Defendants knew that *any* of these statements—and certainly not the generically positive ones—were false.

## VI.   Lead Plaintiffs Cannot Bring Claims on Behalf of Pre-Merger HRG Shareholders Against Spectrum Brands Holdings.

Lead Plaintiffs' attempt to pursue claims on behalf of a class of shareholders of pre-Merger HRG Group Inc. against Spectrum Legacy Brands, Inc., should be rebuffed, both because those investors do not have standing to bring such claims and because Lead Plaintiffs and their counsel have failed to comply with the mandatory procedural requirements of the PSLRA before filing those claims.  (Br. at 43-52.)

### A.   Pre-Merger HRG Shareholders Have No Standing to Sue Spectrum Brands Holdings, Inc. for Damage to Their Pre-Merger HRG Shares.[20]

For the first time in the Amended Complaint, Lead Plaintiffs asserted claims not only on behalf of Legacy Spectrum shareholders, but also a separate class of investors who purchased shares in pre-Merger HRG between January 26, 2017 and November 19, 2018.  But the Amended Complaint does not assert that HRG made any false statements about itself or about Legacy Spectrum.  Nor does it allege that Legacy Spectrum made false statements about HRG. (*See* Br. at 44-45.)  Instead, the HRG shareholder class wants to pursue a claim that they paid artificially high prices for *HRG shares* on the theory that Legacy Spectrum made false statements

---

[20]   Defendants' challenge of pre-Merger HRG investors standing to bring claims against the Individual Defendants is derivative of their standing challenge against pre-Merger Spectrum.  Therefore, Defendants have not waived any challenge to claims against the Individual Defendants on behalf of pre-Merger HRG shareholders.

about *itself*.   HRG shareholders have no standing to sue Legacy Spectrum under these circumstances.

The two Supreme Court decisions on which Lead Plaintiffs place primary reliance do not help them.  Both *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994), and *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), simply hold that investors in a securities issuer can sue anyone who makes false statements *about that issuer*.  Under the rule in those cases, Legacy Spectrum shareholders could sue *anyone* who made false statements about Legacy Spectrum.  But these cases are not applicable here, where the proposed HRG class is attempting to sue Legacy Spectrum, which is *not* alleged to have made any statements at all about HRG.[21]

Lead Plaintiffs also cite *Semerenko* v. *Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) for the proposition that the proposed claim by pre-Merger HRG shareholders satisfies § 10(b)'s "in connection with" requirement.  *Semerenko* is inapplicable here.  The *Semerenko* plaintiffs purchased shares of one corporation (ABI) that was the target of a takeover bid by another corporation (Cendant), and alleged that Cendant made fraudulent misrepresentations in an effort to persuade them to agree to the tender offer.  *Id.* at 171.  The Amended Compliant here alleges that Legacy Spectrum made statements over a 21-month period, starting long *before* a potential transaction with HRG was announced.  In any event, in the 19 years since it was decided,

---

[21]   Lead Plaintiffs also cite *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1184-1191 (D. Or. 2015); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 277 (N.D. Ala. 2009); *Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 481-82 (2d Cir. 2008); *Ziemba* v. *Cascade Int'l Inc.*, 256 F.3d 1194, 1205 (11th Cir. 2001).  Like *Central Bank* and *Stoneridge*, these cases stand for the wholly unremarkable proposition that shareholders of an issuer can sue secondary actors if those secondary actors make false statements regarding the issuer.  Those cases, again, are irrelevant here.

*Semerenko* has never been cited in the Seventh Circuit *or in any other court* for the broad proposition that Lead Plaintiffs advance.[22]

Lead Plaintiffs argue that *Duane & Virginia Lanier Trust* v. *SandRidge Mississippian Trust I*, 361 F. Supp. 3d 1162, 1170-71 (W.D. Okla. 2019), is distinguishable on the basis that the plaintiff and defendant entities were "legally distinct" and received revenue streams from different sources. But HRG and Legacy Spectrum are legally distinct as well, and HRG had other sources of revenue, too. Moreover, in *Duane & Virginia Lanier Trust*, the court rejected claims by investors in one trust who were attempting to sue another trust under § 10(b) because they lacked standing. 361 F. Supp. at 1170-71. That ruling should be applied here.

Oddly, Lead Plaintiffs try to distinguish *APA Excelsior III LP* on the grounds that the plaintiffs in that case did not own stock in the issuer they were attempting to sue. (Opp'n at 56.) But, that is precisely why the case *is* applicable here. Pre-Merger HRG shareholders did not own shares of Spectrum, and thus cannot sue Spectrum for statements it made about itself.

Finally, *Ontario Public Service Employees Union Pension Trust Fund* v. *Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004), remains good law, and was not overruled by *In re NYSE Specialists Securities Litigation,* 503 F.3d 89, 102 (2d Cir. 2007).[23] The Second Circuit in *NYSE Specialists* simply explained that *Nortel* did not preclude Rule 10b-5 claims against entities such as "underwriters, brokers, and non-issuer sellers" for allegedly false statements. *Id.* at 102.

---

[22]    *Nortel* expressly discussed the limited applicability of *Semerenko* on the issue of standing, stating, "the opinion never explicitly addressed the standing requirement of Rule 10b-5, and this limits its persuasiveness. It is unclear whether the *Cendant* court even considered the standing question and it is unreasonable to assume that the court believed standing to be so clearly established that it did not even warrant discussion in the opinion." 369 F.3d at 33.

[23]    *See In re Altisource Portfolio Solutions, S.A. Sec. Litig.*, No. 14-81156-CIV-WPD, 2015 WL 12001262 (Sept. 4, 2015) (holding that alleged misrepresentations a non-issuer company made about the issuing company, even though the companies had a close "business relationship," were not actionable under Rule 10b-5 and *Stoneridge* did not apply).

**B.      Claims by Pre-Merger HRG Shareholders Against Spectrum Should Be Dismissed Because the Statutorily Required PSLRA Process Was Not Followed for a Putative Class of HRG Shareholders.**

There is a second, independent reason why the claims of HRG shareholders should be dismissed:  Lead Plaintiffs and counsel failed to comply with the mandatory PSLRA procedures for the appointment of lead plaintiffs and lead counsel.  As a result, this Court never had the opportunity to make the findings that Congress requires before a class action under the securities laws may proceed.

As Defendants explained in their moving brief, no class of HRG shareholders was identified in the mandatory notices of the pendency of this lawsuit disseminated by counsel.  That is not surprising, since the original complaints did not purport to assert claims on behalf of such a class.  The motion for appointment of lead counsel and lead plaintiff did not seek the Court's approval to pursue claims on behalf of a class of HRG shareholders.  (*See* Opp'n at 48-52.)  And none of Lead Plaintiffs' PSLRA certifications identified any transactions in HRG Group, Inc. securities.  (*Id.*)  This Court was therefore not presented with the opportunity to determine which plaintiff had the largest investment loss in HRG, or to appoint a lead plaintiff to represent HRG shareholders in any putative class action.  Lead Plaintiffs do not explain these failures, but simply ignore them.

Lead Plaintiffs attempt to obscure their multiple failures to comply with the statute by asserting that pre-Merger HRG is somehow encompassed within the definition of "Spectrum" because "'Spectrum Brands Holdings, Inc.' was called HRG before the Merger."  (*See* Br. at 58.) But this is smoke and mirrors.  Before the merger, HRG was called HRG (and not anything else). HRG is not mentioned or listed on any of the required PSLRA documents, and Lead Plaintiffs therefore cannot simply elect to add a new class of HRG shareholders as plaintiffs in this class

action.[24]   Lead Plaintiffs also argue that *post-Merger* purchasers of HRG are members of the proposed Class, but there is no such thing as "post-Merger HRG," Lead Plaintiffs are referring to the new entity, Spectrum Brands Holdings.  And, in any event, the HRG investor class at issue here is expressly limited to pre-Merger investors.

Lead Plaintiffs also argue, incorrectly, that even if they did not comply with the statutorily mandated PSLRA process, no notice is necessary.  (Opp'n at 58.)  For support, they cite to *Rauch* v. *Vale, S.A.*, 378 F. Supp. 3d 198, 207 (E.D.N.Y 2019), but that case involved only expanding a class period for the *same* security (and adding a new defendant).  *See id.* at 205.  It did not permit the proposed lead plaintiffs in that case to represent an entirely separate public company's class of shareholders without first complying with the PSLRA requirements.

Finally, Lead Plaintiffs argue that the only proper remedy for their persistent errors in this regard is republication of the notice.  (*See* Opp'n at 58-59.)  However, cases requiring republication of new PSLRA notices involve adding new claims, new defendants, or expanding the class period.  Those cases do not involve adding an entirely new class of shareholders, who held securities in an entirely separate corporate entity.[25]

The fact that the parties can identify no decisions addressing this precise issue (one way or the other) is attributable to the fact that, until now, no plaintiffs and counsel have ever tried

---

[24]   During the merger, Legacy Spectrum (f/k/a Spectrum Brands Holdings, Inc.) merged into an HRG subsidiary, and this new entity renamed itself Spectrum Brands Holding, Inc.  (*See* Br. at 11-12.)  No reasonable HRG investor would understand this to mean that "Spectrum Brands Legacy, Inc. (f/k/a Spectrum Brands Holdings, Inc.)" *also* includes HRG.

[25]   Some courts have required new notices as a remedy when an amended complaint substantially alters the claims or class members, but those cases, as a rule, involve additional investors of the same security at issue, not investors in different securities.  *See, e.g.*, *Kipling* v. *Flex, Ltd.*, No. 18-CV-02706-LHK, 2019 WL 1472358, at *2 (N.D. Cal. Apr. 3, 2019); *Hachem* v. *Gen. Elec., Inc.*, No. 17-CV-8457 (JMF), 2018 WL 1779345, at *1-2 (S.D.N.Y. Apr. 12, 2018); *Waldman* v. *Wachovia Corp.*, No. 08 Civ. 2913 (SAS), 2009 WL 2950362, at *1 (S.D.N.Y. Sept. 14, 2009); *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 2005 WL 1322721, at *2 (S.D.N.Y. Jun. 1, 2005); *In re Select Comfort Corp. Sec. Litig.*, No. 99 Civ. 884, 2000 WL 35529101, at *7-8 (D. Minn. Jan. 27, 2000).

to end-run the congressionally mandated PSLRA process by engaging in self-help in this way. The PSLRA contains a procedural process with mandatory requirements. Lead Plaintiffs now ask this Court to agree that those provisions are a dead letter whenever counsel does not want to comply. The Court should deny that request, and dismiss the proposed pre-Merger HRG class from this action.

## VII.    The Section 20(a) Claims Must Be Dismissed for Failure to Plead a Primary Violation.

Because the Amended Complaint has failed to allege a primary violation of the securities laws against the Individual Defendants, Spectrum, and HRG, for the reasons set forth in Defendants' moving brief and above, Lead Plaintiffs' Section 20(a) claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Amended Complaint should be dismissed with prejudice in its entirety.

Dated: November 6, 2019

Respectfully submitted,

/s/ Matthew D. Lee
Matthew D. Lee, WI Bar No. 1061375
FOLEY & LARDNER LLP
150 East Gilman Street, Suite 5000
Madison, WI 53703-1482
Tel.: 608-257-5035
Fax: 608-258-4258
mdlee@foley.com

Richard A. Rosen, admitted *pro hac vice*
Andrew J. Ehrlich, admitted *pro hac vice*
Adam J. Bernstein, admitted *pro hac vice*
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: 212-373-3000
Fax: 212-757-3990
rrosen@paulweiss.com
aehrlich@paulweiss.com
abernstein@paulweiss.com

*Attorneys for Defendants*